Duval & Stachenfeld LLP
Attorneys for Plaintiff
By:  Timothy J. Pastore, Esq.
101 Park Avenue, 11th Floor
New York, New York 10178
Tel. No.:  (212) 883-1700

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- x

THE BANK OF NEW YORK MELLON TRUST          :
COMPANY, NATIONAL ASSOCIATION, TRUSTEE     :
FOR THE REGISTERED CERTIFICATE HOLDERS OF  :
MORGAN STANLEY CAPITAL I INC.,             :
COMMERCIAL MORTGAGE PASS-THROUGH           :     **FIRST AMENDED**
CERTIFICATES SERIES 2007-IQ14, ACTING BY AND :   **COMPLAINT**
THROUGH C-III ASSET MANAGEMENT LLC, AS     :
SPECIAL SERVICER,                          :
                                           :     11 Civ. 0505 (CM)(GWG)
                            Plaintiff,      :
                                           :
            -against-                      :
                                           :
MORGAN STANLEY MORTGAGE CAPITAL, INC.,     :
                                           :
                            Defendant.      :
-------------------------------------------------------------------- x

      Plaintiff The Bank of New York Mellon Trust Company, National Association

(hereinafter the "Trustee" or "Plaintiff"), as trustee for the registered certificate holders of

Morgan Stanley Capital I Inc., Commercial Mortgage Pass-Through Certificates Series 2007-

IQ14 (the "Trust"), acting by and through C-III Asset Management LLC, as Special Servicer (the

"Special Servicer"), for its First Amended Complaint against defendant Morgan Stanley

Mortgage Capital, Inc. ("MSMCI" or "Defendant"), alleges as follows:

## NATURE OF THE ACTION

      1.     This is a breach of contract action arising out of the breach, with material and

adverse consequences, of certain false representations and warranties made by MSMCI with

respect to a certain $81,000,000.00 mortgage loan originated by MSMCI and transferred to the

Trust by Morgan Stanley Capital I, Inc. (the "Morgan Stanley Securitization Depositor").

Plaintiff, acting by and through the Special Servicer of the Trust, brings this action seeking a judgment directing MSMCI to meet its contractual obligations to repurchase the mortgage loan.

**THE PARTIES**

2.      Plaintiff The Bank of New York Mellon Trust Company, National Association is the successor by merger to The Bank of New York Trust, and is the Trustee of the Trust under the terms of the PSA (defined below).  As the Trustee of the Trust, Plaintiff owns all the legal right, title and interest to, and possesses the customary power to hold, manage and dispose of, the assets of the Trust for the benefit of certificate holders of the Trust.  Plaintiff is a national banking association with its designated main office at 700 South Flower Street, Suite 200, Los Angeles, California 90017.

3.      C-III Asset Management LLC is formerly known as Centerline Servicing Inc. and is the Special Servicer of the Trust under the terms of the PSA (defined below).  In accordance with the terms of the PSA, the Special Servicer provided the Trustee with the required notice of the Special Servicer's intention to bring this action.  The Special Servicer has been duly authorized by the Trustee, in writing, to retain counsel and bring this action on behalf of the Trustee.

4.      Defendant Morgan Stanley Mortgage Capital, Inc. is a corporation organized and existing under the laws of the State of New York.  Defendant was the originating lender of the mortgage loan at issue in this case and the seller of such loan.  Defendant maintains its principal place of business at 1585 Broadway, New York, New York 10036.

**JURISDICTION AND VENUE**

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1332 and 1348 in that the matter in controversy is in excess of $75,000 exclusive of interest and costs, and is between citizens of New York and California.

6.      Venue is proper in this District under 28 U.S.C. § 1391(a) because Defendant has its principal place of business in this District, a substantial part of the events or omissions giving rise to the claims occurred in this District, and Defendant is subject to personal jurisdiction in this District as of the date this action was commenced.

**FACTUAL ALLEGATIONS**

**A.  The Mortgage Loan and the Environmental Conditions Affecting the Property**

7.      The Trust is a trust created by the Morgan Stanley Securitization Depositor pursuant to a Pooling and Servicing Agreement, dated May 1, 2007 (the "PSA"), to hold a pool of securitized loans.  One of the loans that is held by the Trust is a mortgage loan in the original principal amount of $81,000,000.00 (the "Mortgage Loan") made by MSMCI to City View Center, LLC ("Borrower").

8.      The Mortgage Loan was made by MSMCI pursuant to a certain Loan Agreement with Borrower, dated December 29, 2006 (the "Loan Agreement"), and in connection with Borrower's purchase of a retail shopping center from Garfield Land Development, LLC ("Garfield").

9.      The shopping center is located at the intersection of Transportation Boulevard and Interstate Highway 480, Garfield Heights, Ohio and is situated on a site formerly occupied by two municipal landfills (the "Property").

10.     Due to certain environmental conditions and circumstances affecting the Property, it was developed pursuant to authorization (the "Rule 13 Authorization") from the Ohio Environmental Protection Agency ("Ohio EPA").

11.     The Rule 13 Authorization is subject to certain covenants and restrictions contained in certain Final Findings and Orders issued by the Director of the Ohio EPA, dated March 18, 2005 (the "2005 Orders").

3

12.     The 2005 Orders required the developers of the Property and their successors in interest (such as Borrower) to, *inter alia*: install protective engineered components; monitor for elevated levels of landfill gas (methane); prevent and manage contaminated runoff, called leachate; and prevent and manage the methane gas generated at and migrating from the landfills.

13.     Throughout the development of the Property, the developers, including the Borrower, repeatedly and materially failed to comply with the 2005 Orders and the Rule 13 Authorization.

14.     Consequently, during the period 2005 to 2008, the Ohio EPA issued multiple Notices of Violation ("NOV" or "NOVs") affecting the Property.

15.     As a result of the non-compliance with the Rule 13 Authorization and the 2005 Orders, and other conditions at the Property, the Property was affected by material and adverse environmental conditions and circumstances consistently from at least 2005 to 2008, including, but not limited to, the presence of methane gas and leachate.

16.     The Mortgage Loan became a Specially Serviced Mortgage Loan, as defined in the PSA, on November 12, 2008.  The Borrower defaulted on the payment of the Mortgage Loan on or about October 8, 2008.

**B.  Borrower's False Representation Concerning the Wal-Mart Lease**

17.     At the time the Borrower purchased the Property, the shopping center was anchored by a Wal-Mart retail store (the "Wal-Mart Store"), pursuant to a lease agreement dated March 7, 2005 (the "Wal-Mart Lease").

18.     Wal-Mart leased approximately twenty-nine percent of the net square footage at the shopping center -- a space which was greater than the space occupied by the next two largest tenants combined.

4

19.     Beginning in November 2006, and as set forth more fully below, Wal-Mart repeatedly cited defaults under the Wal-Mart Lease based on construction defects and the adverse environmental conditions and circumstances plaguing the Property, including, but not limited to, repeated methane gas intrusions at the Wal-Mart Store.

20.     Despite this, and despite the fact that the defaults cited by Wal-Mart were uncured as of December 29, 2006, Borrower represented in Section 3.1.22 of its Loan Agreement with MSMCI that "[T]here are no defaults [under the Leases identified on Schedule I to the Loan Agreement, which includes the Wal-Mart Lease] by either party [to each scheduled lease]."

21.     Section 10.1(a)(v) of the Loan Agreement provides (in part) that an Event of Default occurs "if any representation or warranty made by Borrower herein or any other Loan Document, or in any report, certificate, financial statement or other instrument, agreement or document furnished to Lender shall have been *false or misleading* in any material respect as of the date the representation or warranty was made" (emphasis added).

22.     In truth, and as set forth more fully below, Borrower was in default under the Wal-Mart Lease at the time it entered into the Loan Agreement on December 29, 2006.

23.     Therefore, the representation made by Borrower in Section 3.1.22 of the Loan Agreement was materially false or misleading, and constituted an Event of Default under the Loan Agreement.

24.     Despite Borrower's default under the Loan Agreement and MSMCI's knowledge thereof, the Mortgage Loan was pooled with other mortgage loans by MSMCI and subsequently securitized by the Morgan Stanley Securitization Depositor for investment by investors in the assets of the Trust (the "Securitization").

### C.  MSMCI's False Representations Under the Mortgage Loan Purchase Agreement

25.     Pursuant to a certain Mortgage Loan Purchase Agreement, dated as of May 1, 2007 (the "MLPA"), entered into among MSMCI, as seller, and the Morgan Stanley Securitization Depositor, as purchaser, MSMCI sold, conveyed and assigned numerous loans to the Morgan Stanley Securitization Depositor, one of which was the Mortgage Loan.  Annexed hereto as Exhibit A and incorporated by reference herein is a true and correct copy of the MLPA.

26.     Pursuant to Representation 12(i) of Exhibit 2 of the MLPA (the "Environmental Conditions Representation"), MSMCI represented and warranted that:

> [A]n environmental site assessment, or an update of a previous such report, was performed with respect to each Property in connection with the origination or the acquisition of the related Mortgage Loan, a report of each such assessment (or the most recent assessment with respect to each Property) (an "Environmental Report") has been delivered to the Purchaser, and *[MSMCI] has no knowledge of any material and adverse environmental condition or circumstance affecting any Property that was not disclosed in such report.*  Each Mortgage requires the related Mortgagor to comply with all applicable federal, state and local environmental laws and regulations.

MLPA, Ex. 2, Representation 12(i) (emphasis added).

27.     The only environmental report with respect to the Property that was provided to Purchaser (the Morgan Stanley Securitization Depositor) and subsequently delivered to the Trustee at the time of the closing of the sale of the Mortgage Loan under the MLPA was a Phase I Environmental Site Assessment of the Property, dated July 25, 2006, prepared by IVI Due Diligence Services, Inc. (the "IVI Report").

28.     At the time it made the Environmental Conditions Representation, MSMCI knew that there were material and adverse environmental conditions or circumstances affecting the Property that were not disclosed in the IVI Report.  Therefore, the Environmental Conditions Representation was false at the time it was made.

6

29.     In addition, pursuant to Representation 27 of Exhibit 2 of the MLPA (the "No

Material Default Representation"), MSMCI represented that:

> *To [MSMCI's] knowledge, there exists no material default, breach,*
> *violation or event of acceleration (and no event which, with the*
> *passage of time or the giving of notice, or both, would constitute*
> *any of the foregoing)* under the documents evidencing or securing
> the Mortgage Loan, in any such case *to the extent the same*
> *materially and adversely affects the value of the Mortgage Loan*
> *and the related Property*; provided, however, that this
> representation and warranty does not address or otherwise cover
> any default, breach, violation or event of acceleration that
> specifically pertains to any matter otherwise covered by any other
> representation and warranty made by the Seller elsewhere in this
> Exhibit 2 or the exceptions listed in Schedule A attached hereto.

MLPA, Ex. 2, Representation 27 (emphasis added).

30.     The MLPA further provides:

> The fact that the Purchaser has conducted or has failed to conduct
> any partial or complete examination of the credit files,
> underwriting documentation or mortgage files for the Mortgage
> Loans shall not affect the right of the Purchaser or the Trustee to
> cause Seller [MSMCI] to cure any Material Document Defect or
> Material Breach . . . or to repurchase or replace the defective
> Mortgage Loans pursuant to Section 5 of this Agreement.

Id. § 5.

31.     At the time it made the No Material Default Representation, MSMCI knew that

the Borrower was in default of the Borrower's lease with Wal-Mart.  Therefore, the No Material

Default Representation was false at the time it was made.

32.     The breach by MSMCI of the Environmental Conditions Representation

materially and adversely affects the value of the Mortgage Loan and the Mortgage Loan is a

Specially Serviced Mortgage Loan.

33.     The breach by MSMCI of the No Material Default Representation materially and

adversely affects the value of the Mortgage Loan and the Mortgage Loan is a Specially Serviced

Mortgage Loan.

**D.  The Trustee Succeeds to the Rights of the Morgan Stanley Securitization Depositor
     Under the MLPA**

34.     Simultaneously with the execution of the MLPA, Plaintiff entered into the PSA,

with, *inter alia*, the Morgan Stanley Securitization Depositor, as depositor.  Annexed hereto as

Exhibit B and incorporated by reference herein is a true and correct copy of the PSA.

35.     Under the PSA, the Trustee is the successor in interest to the rights of the Morgan

Stanley Securitization Depositor under the MLPA.  See PSA § 2.1.

36.     Also, pursuant to a certain Omnibus Assignment, dated May 30, 2007 (the

"Omnibus Assignment"), MSMCI transferred to the Trustee "all right, title and interest . . . in

and to the [Mortgage Loan]."

37.     Pursuant to the PSA, MLPA and Omnibus Assignment, the representations and

warranties made by MSMCI in the MLPA were assigned and transferred to the Trustee as if they

were made by MSMCI to the Trustee directly.  See PSA § 2.1(a) and MLPA §§ 4(a) and 5(a).

**E.  The IVI Report Omits Reference to the Adverse Environmental Conditions and
     Circumstances Affecting the Property**
.

38.     As set forth above, MSMCI represented and warranted in the MLPA that it had

"no knowledge of any material and adverse environmental condition or circumstance affecting

[the property] that was not disclosed in [the IVI Report]."

39.     This representation and warranty was false when made as MSMCI was aware that

the IVI Report failed to include significant information concerning material and adverse

environmental conditions and circumstances affecting the Property.

40.     In fact, the IVI Report was merely an updated version of a previous

environmental site assessment prepared by IVI of the Property in 2005.

41.     Without limitation, the IVI Report: (a) contained, among other things, outdated

and inaccurate statements from Ohio EPA personnel -- including an incorrect statement that

"there are no outstanding violations at the [Property]"; (b) failed to discuss numerous NOVs issued by Ohio EPA concerning adverse environmental conditions at the Property; (c) incorrectly concluded that there is "no evidence of recognized environmental conditions in connection with the [Property] and no further investigation is currently recommended"; and (d) did not identify the presence of methane at the Property as a "recognized environmental condition."

**F.  The HzW Report Identifies Material and Adverse Environmental Conditions and Circumstances Affecting the Property**

42.     In connection with the purchase of the Property, Thomas Klein ("Klein"), the sole owner of Borrower, commissioned HzW Environmental Consultants, LLC ("HzW") to prepare an environmental site assessment of the Property separate from the IVI Report.

43.     Unlike the IVI Report, the HzW Phase I Environmental Site Assessment of the Property, dated November 2006 (the "HzW Report"), found the presence of methane gas problematic throughout the Property and the structures located thereon.

44.     For example, the HzW Report identifies an October 24, 2006 "anonymous" complaint to Ohio EPA of "possible methane migrating into the building" of the Nails and Company store located at the Property.

45.     The HzW Report also contains summaries of interviews of Ohio EPA personnel, Judy Bowman ("Bowman") and Karen Naples ("Naples").

46.     The HzW Report quotes Bowman as saying, "methane gas generation is the agency's primary concern [with respect to the Property,] with leachate generation and management a close second."

47.     Bowman also indicated that there were "problems" with the "placement of the liner underneath the [Property] to block methane migration" and with the "placement of the methane collection system under the building pads and parking areas."

48.     Similarly, Naples confirmed that the methane liner at the Property had not been placed in accordance with the Rule 13 Authorization, the light posts did not have the appropriate number of methane vents and that the methane alarms in the buildings could only be shut down by the fire department, causing the occupants to have to evacuate the entire building or perhaps even all the buildings at the Property when the alarm went off.

49.     Based on its assessment, HzW concluded that, due to its explosive nature and noxious qualities, the methane gas present at the Property was a "recognized environmental condition."

50.     HzW further concluded that the current enforcement state of the Property, along with the continuing obligations associated with complying with the ongoing enforcement activities (both of which include methane gas issues) created a "business environmental risk," which HzW defined as "[a] risk which can have a material environmental or environmentally-driven impact on the business associated with the current or planned use of a parcel of commercial real estate[.]"

51.     Unlike the IVI Report, the HzW Report also identified the presence of leachate at the Property as a "recognized environmental condition."

52.     Upon information and belief, MSMCI was aware and had knowledge of the contents of the HzW Report at the time it made its representations and warranties under the MLPA.

53.     The HzW Report -- which painted a much different picture regarding the adverse environmental conditions and circumstances affecting the Property -- was not provided to the Trustee at the time of the closing of the transactions entered into under the MLPA and the PSA.

54.     Instead, all that MSMCI supplied to the Trustee in connection with the sale of the Mortgage Loan was the IVI Report.

**G. Wal-Mart Notices a Default Under the Wal-Mart Lease as a Result of Adverse Environmental Conditions and Circumstances Affecting the Property**

55.     On or about November 14, 2006, Wal-Mart provided oral notice to its then landlord, Garfield, that elevated levels of methane gas were being detected at the Wal-Mart Store.

56.     From December 5, 2006 to December 7, 2006, Wal-Mart was forced to close the Wal-Mart Store due to methane gas intrusions at the Property.

57.     On or about December 14, 2006, counsel to Wal-Mart delivered a written Notice of Default (the "First Notice of Default") to Garfield, pursuant to the Wal-Mart Lease.

58.     The First Notice of Default cited methane gas intrusion at the Wal-Mart Store and Garfield's failure to deliver a fully effective and operational venting system for the methane gas.

59.     As a result of the default under the Wal-Mart Lease, Wal-Mart and Garfield entered into two letter agreements, dated December 26, 2006 and December 28, 2006 (collectively, the "December Letter Agreements").

60.     The December Letter Agreements governed the monitoring of methane gas in the Wal-Mart Store and imposed on Garfield the obligation to make certain warranty repairs to the structural defects causing the intrusions of methane gas.

61.     In the December 28, 2006 letter agreement (also referred to as the "Lease Warranty Undertaking"), Garfield acknowledged that certain warranty repairs were necessary.

62.     The December 28, 2006 letter agreement also noted that the "undertaking is given to provide a *partial* resolution" (emphasis added), demonstrating that Garfield did not expect to fully resolve the problems at the Property.

63.     In addition to the December Letter Agreements, Borrower, as buyer, and Garfield, as seller, entered into a "Wal-Mart Indemnity Agreement" on December 28, 2006.

64.     The Wal-Mart Indemnity Agreement specified the rights and obligations of Borrower and Garfield with respect to the obligations under the December Letter Agreements and, particularly, with respect to the methane monitoring and warranty repairs.

65.     In connection with the closing of the Mortgage Loan, on or about December 28, 2006, an estoppel certificate (the "Wal-Mart Estoppel") was delivered to MSMCI by Wal-Mart.

66.     The Wal-Mart Estoppel detailed the two-day closure of the Wal-Mart Store from December 5, 2006 to December 7, 2006 due to intrusions of methane gas.

67.     The Wal-Mart Estoppel also referenced the December Letter Agreements and thereby highlighted the outstanding and unresolved environmental problems at the Property.

68.     MSMCI received the December Letter Agreements together with the Wal-Mart Estoppel.

69.     By virtue of its receipt of the Wal-Mart Estoppel and the December Letter Agreements, MSMCI had knowledge of material and adverse environmental conditions or circumstances affecting the Property.

70.     MSMCI knew that these material and adverse environmental conditions or circumstances were not disclosed in the IVI Report.

71.     Despite this, as set forth above, MSMCI represented and warranted in the MLPA that it had "no knowledge of any material and adverse environmental condition or circumstance affecting" the Property, other than as set forth in the IVI Report.

72.     In addition, by virtue of its receipt of the Wal-Mart Estoppel and the December Letter Agreements, MSMCI had knowledge of a default under the Wal-Mart Lease.

73.     Therefore, MSMCI knew that Borrower's representation in Section 3.1.22 under the Loan Agreement that there was no default under the Wal-Mart Lease was false.

**H. MSMCI Receives Direct Notice of NOVs Affecting the Property**

74.     On or about December 29, 2006, counsel for Borrower delivered a letter to MSMCI's counsel (the "December 29 Letter") in which counsel for Borrower references a "December 22, 2006 report" prepared by HzW at the request of MSMCI regarding "the estimated cost to resolve [the then] pending NOVs."

75.     In the December 29 Letter, counsel to Borrower also notified MSMCI that he had "received three additional NOVs, dated November 11, November 21 and November 22, 2006."

76.     In the December 29 Letter, counsel to Borrower also confirmed that "[a]ll of the NOVs, including the three most recent NOVs" have been reviewed by HzW as part of its December 22, 2006 report.

77.     By virtue of the December 29 Letter, MSMCI had knowledge of multiple NOVs affecting the Property and which were not disclosed in the IVI Report.

78.     Despite this, as set forth above, MSMCI represented and warranted in the MLPA that it had "no knowledge of any material and adverse environmental condition or circumstance affecting" the Property, other than as set forth in the IVI Report.

**I. MSMCI is Explicitly Advised of the Deficiencies Contained in the IVI Report**

79.     Counsel to MSMCI prepared a report, dated January 4, 2007, entitled "Morgan Stanley Mortgage Capital Inc. Closing Counsel Transaction Summary" ("Closing Summary"), which report was prepared to summarize certain aspects of the Mortgage Loan.

80.     Item 62 of the Closing Summary, entitled "Exceptions to Representations and Warranties," includes the following statement with respect to the Environmental Conditions Representation:

> 12(i)   The Phase I environmental report did not address the fact that the [Property] is subject to regulation under the Resource Conservation and Recovery Act ("RCRA") since it is a regulated closed land fill. *It also did not address the numerous "notices of*

> *violation" issued by the Ohio Environmental Protection Agency*
> *that the [Property] and adjoining properties are subject to. The*
> *environmental insurance policy (yet to be issued) does not cover*
> *the existing notices of violation.* The policy does not extend
> beyond loan maturity.

(emphasis added).

81.     Upon information and belief, the "Phase I environmental report" referenced in the

foregoing statement was the IVI Report.

82.     By virtue of the Closing Summary, MSMCI had knowledge that the IVI Report

failed to include information regarding the material and adverse environmental conditions and

circumstances affecting the Property.

83.     Despite this, MSMCI subsequently represented and warranted in the MLPA that it

had "no knowledge of any material and adverse environmental condition or circumstance

affecting" the Property, other than as set forth in the IVI Report.

**J.  Material and Adverse Environmental Conditions and Circumstances Persist at the
Property Leading Up to the Sale of the Mortgage Loan to the Trust**

84.     In the months leading up to the sale of the Mortgage Loan to the Trust, the

material and adverse environmental conditions and circumstances affecting the Property

persisted and grew worse.

85.     Upon information and belief, on or about January 8, 2007, Wal-Mart delivered to

Borrower a second notice of default (the "Second Default Notice") under the Wal-Mart Lease, as

a result of Borrower's failure to correct and prevent methane gas intrusions at the Wal-Mart

store.

86.     On or about February 16, 2007, the Ohio EPA issued an NOV (the "February

2007 NOV") to Borrower for its failure to remove excavated waste material to limited areas on

the Property, as required by the 2005 Orders.

87.     On or about February 23, 2007, Wal-Mart delivered a letter to Borrower detailing ongoing problems with methane intrusion.

88.     On or about March 6, 2007, the Ohio EPA issued an NOV (the "March 2007 NOV") to Borrower for its continuing failure to comply with the 2005 Orders.

89.     On or about March 27, 2007, counsel for Wal-Mart delivered a third notice of default (the "Third Default Notice") under the Wal-Mart Lease, which again cited Borrower's failure to correct the methane gas intrusions into the Wal-Mart store.

90.     Upon information and belief, MSMCI had knowledge of the February 2007 NOV, the March 2007 NOV, the Second Default Notice, and the Third Default Notice at the time it entered into the MLPA and made its representations and warranties thereunder.

91.     The February 2007 NOV, the March 2007 NOV, the Second Default Notice, and the Third Default Notice were not referenced in the IVI Report.

92.     Despite this, as set forth above, MSMCI represented and warranted in the MLPA that it had "no knowledge of any material and adverse environmental condition or circumstance affecting" the Property, other than as set forth in the IVI Report.

**K. Adverse Environmental Conditions and Circumstances at the Property Continue After the Sale of the Mortgage Loan to the Trust**

93.     In the months following the transfer of the Mortgage Loan from MSMCI to the Trustee, the material and adverse environmental conditions and circumstances affecting the Property persisted and became much worse.

94.     On or about June 21, 2007, counsel for Wal-Mart delivered a fourth notice of default under the Wal-Mart Lease to Borrower (the "Fourth Default Notice").

95.     The Fourth Default Notice cited continuing construction defects and adverse environmental conditions affecting the Wal-Mart Store, including the "persistent failure of the sanitary sewer plumbing in all restrooms and the janitorial sink," "periodic methane intrusion,"

and the "ineffectiveness of the Methane Venting System to reduce or eliminate methane buildup under the building slab."

96.    On or about July 7, 2008, the Ohio EPA filed suit (the "Ohio EPA Lawsuit") against, among others, Borrower, Garfield, the McGill Property Group, LLC, McGill, and the City of Garfield Heights (collectively, the "Ohio EPA Lawsuit Defendants").

97.    In the Ohio EPA Lawsuit, the Ohio EPA cited violations of, *inter alia*, the 2005 Orders and sought to "remedy Defendants' past and continuing violations of Ohio's solid waste and water pollution laws."

98.    The Ohio EPA Lawsuit stated that "[f]rom March 18, 2005 to present, Ohio EPA and the Cuyahoga County Board of Public Health have issued at least twenty-one (21) Notices of Violation to Defendants . . . for failure to properly manage and control leachate at the [Property] as required by the 2005 Orders and the [Rule 13 Authorization].  Three of the 21 Notices of Violation were also sent to [Borrower]."

99.    In total, the Ohio EPA Lawsuit included twenty-three counts of ongoing environmental violations at the Property.

100.    The Ohio EPA Lawsuit also stated that results of monitoring performed prior to closing of the MLPA showed "explosive levels" of methane gas in the sewer system at the Property.

101.    On or about August 21, 2008, the entity acting as loan servicer on behalf of the Trustee delivered a notice of default under the Loan Agreement to Borrower, citing the Ohio EPA Lawsuit and Borrower's failure to complete the environmental work required by the Loan Agreement as effective defaults under the Loan Agreement, and demanding that such defaults be cured within thirty days.

102.    On or about August 28, 2008, the U.S. Department of Health & Human Services ("HHS") delivered a letter to the U.S. Environmental Protection Agency ("US EPA"), after reviewing data from the Property.

103.    Among other things, HHS determined that "conditions exist [at the Property] for an urgent public hazard based on the migration of combustible gases into onsite buildings and the potential for an explosion or fire."

104.    On or about August 29, 2008, the US EPA delivered a letter to the Ohio EPA, upon their request for technical assistance, informing them of their testing and analysis of the Property.

105.    Among other things, the US EPA determined that "methane is present in the storm and sanitary sewers and utility vaults in and around the City View Center.  The levels identified range from 0% to over 100% of the lower explosive limit for methane, and concentrations have been identified as high as 68% by volume in air.  Methane is potentially explosive in air at levels between 5 and 15% by volume in air."

106.    The US EPA also identified "the presence of several volatile and semi-volatile compounds in the samples of the gases present at City View Center."

107.    On or about December 2, 2008, Judge Kenneth R. Callahan of the Cuyahoga County Court of Common Pleas delivered a Consent Order resolving the Ohio EPA Lawsuit (the "2008 Consent Order").

108.    The 2008 Consent Order contains various orders directed to the Ohio EPA Lawsuit Defendants with respect to improvement of extraction and containment systems and monitoring programs and ongoing compliance with Ohio EPA regulations.

**L. Wal-Mart Terminates the Wal-Mart Lease as a Result of the Environmental Conditions and Construction Defects at the Property**

109.    Due to the worsening environmental conditions and construction defects at the Property, on or about September 5, 2008, counsel for Wal-Mart delivered a fifth notice of default under the Wal-Mart Lease to Borrower (the "Fifth Default Notice"), again citing problems with methane gas intrusion at the Wal-Mart Store and the failure of sanitary sewer lines.

110.    On or about September 15, 2008, Wal-Mart closed the Wal-Mart Store and publicly announced that it had ceased operations at City View Center.

111.    On or about September 18, 2008, counsel for Wal-Mart delivered a sixth notice of default under the Wal-Mart Lease to Borrower (the "Sixth Default Notice").

112.    The Sixth Default Notice again cited the methane gas intrusions at the Wal-Mart Store and failure of the sanitary sewer systems.

113.    The Sixth Default Notice also referenced Wal-Mart's decision to cease operations at the Wal-Mart Store and abate rent under the Wal-Mart Lease.

114.    Wal-Mart was an anchor tenant at the Property and was a significant factor in attracting business to the retail center thereon.

115.    In or around September 2008, the Borrower received additional notices of default from other tenants at the Property, including Concord Buying Group Inc., Bed Bath & Beyond Inc., Payless ShoeSource Inc., FBRG II, LLC, and OfficeMax, Inc.

116.    On or about September 29, 2008, the loan servicer delivered a second notice of default under the Loan Agreement to the Borrower, citing the Ohio EPA Lawsuit and the Borrower's failure to complete the environmental work required by the Loan Agreement as effective defaults under the Loan Agreement, and demanding that such defaults be cured before November 20, 2008.

117.    On or about October 24, 2008, counsel for Wal-Mart delivered a seventh notice of default to Borrower under the Wal-Mart Lease (the "Seventh Default Notice"), again citing Wal-Mart's decision to abate rent due to the environmental conditions and circumstances at the Property "materially and adversely" impacting its ability to do business.

118.    On or about December 4, 2008, counsel for Wal-Mart delivered an eighth notice of default under the Wal-Mart Lease to Borrower (the "Eighth Default Notice"), again citing the conditions on the Wal-Mart Store premises and the failure of Borrower to correct such problems.

119.    Although the Fourth through Eighth Default Notices were sent by Wal-Mart to MSMCI and its counsel, neither MSMCI nor its counsel forwarded the Default Notices to the Trustee or the Special Servicer.

120.    On or about January 15, 2009, counsel for Wal-Mart delivered a letter to the Borrower, citing the conditions at the Wal-Mart Store and the decision on the part of Wal-Mart to cease paying "100% of the installments of Annual Rent and Common Area Charges otherwise payable on account of the defaults."

121.    On or about January 30, 2009, counsel for Wal-Mart informed the Borrower that Wal-Mart was terminating the Wal-Mart Lease in accordance with its terms.

**M. Borrower Defaults on Mortgage Loan**

122.    The departure of Wal-Mart, as the largest tenant at the Property, had a material and adverse affect on the value of the Property and Mortgage Loan.

123.    Shortly after Wal-Mart's termination of the Wal-Mart Lease, the Borrower failed to meet its debt service payments under the Mortgage Loan.

124.    The Property is now under receivership and the Mortgage Loan remains in default and has lost significant value, causing substantial damage to the Trust and the investors on whose behalf the Trust's assets are held.

**N.  The Trustee Notifies MSMCI of its Breach of Representations**

125.    Following a detailed investigation into the facts and circumstances constituting a breach of the Environmental Conditions Representation, the Special Servicer, on behalf of the Trustee, and in compliance with the notice provisions of the PSA, delivered a Notice of Material Breach to MSMCI, dated March 18, 2009 (the "First Notice of Material Breach"), in which the Special Servicer notified MSMCI of MSMCI's breach of the Environmental Conditions Representation, and requested that MSMCI cure such false representation within the ninety-day cure period provided for in the MLPA or repurchase the Mortgage Loan in accordance with the terms of the MLPA and PSA.  Annexed hereto as Exhibit C and incorporated herein by reference is a true and correct copy of the First Notice of Material Breach.

126.    On or about May 11, 2009, MSMCI responded in writing to the First Notice of Material Breach by refusing to cure the breach of the Environmental Conditions Representation identified in the First Notice of Material Breach or to repurchase the Mortgage Loan.

127.    Following a detailed investigation into the facts and circumstances constituting a breach of the No Material Default Representation in the MLPA, the Special Servicer, on behalf of the Trustee, and in compliance with the notice provisions of the PSA, delivered a Second and Supplemental Notice of Material Breach to MSMCI, dated September 24, 2010 (the "Second Notice of Material Breach").  Annexed hereto as Exhibit D and incorporated herein by reference is a true and correct copy of the Second Notice of Material Breach.

128.    The Second Notice of Material Breach restated and supplemented the breach of the Environmental Conditions Representation, cited the breach of the No Material Default Representation, and requested that MSMCI cure such false representations within the ninety-day cure period provided for in the MLPA or repurchase the Mortgage Loan in accordance with the terms of the MLPA and PSA.

129.     On or about December 22, 2010, MSMCI responded in writing to the Second

Notice of Material Breach by refusing to cure the breaches of the Environmental Conditions

Representation and the No Material Default Representation identified in the Second Notice of

Material Breach or to repurchase the Mortgage Loan.

130.     Pursuant to Section 5(b) of the MLPA, if MSMCI fails to cure a breach of a

representation and warranty that materially adversely affects the value of the Mortgage Loan, it

must repurchase the Mortgage Loan.

**FIRST CLAIM FOR RELIEF**

**(Breach of the MLPA -- Environmental Conditions Representation)**

131.     Plaintiff realleges the foregoing paragraphs of this complaint as if fully set forth

herein.

132.     The MLPA and PSA constitute valid contracts supported by valuable

consideration.

133.     Plaintiff is the successor in interest to the Morgan Stanley Securitization

Depositor under the MLPA.

134.     Pursuant to the Environmental Conditions Representation in the MLPA, MSMCI

represented that, except as set forth in an Environmental Report provided to the Purchaser, it had

"no knowledge of any material and adverse environmental condition or circumstance affecting

any Property[.]"

135.     The IVI Report was the only Environmental Report that MSMCI provided to

Purchaser and subsequently delivered to the Trustee at the time of the closing of the sale of the

Mortgage Loan under the MLPA.

136.     The IVI Report did not disclose numerous material and adverse environmental

conditions or circumstances affecting the Property.

137.     Contrary to the Environmental Conditions Representation, MSMCI had knowledge of material and adverse environmental conditions or circumstances affecting the Property at the time it entered into the MLPA that were not disclosed in the IVI Report.

138.     Therefore, at the time given, the Environmental Conditions Representation was false.

139.     In accordance with the terms of the MLPA and PSA, on March 18, 2009, the Special Servicer, on behalf of the Trustee, provided MSMCI with written notice of the aforementioned breach of the Environmental Conditions Representation, and demanded that MSMCI cure the breach or, failing that, repurchase the Mortgage Loan.

140.     By letter dated May 11, 2009, MSMCI rejected the Trustee's demand and disputed any and all liability to cure the breach or repurchase the Mortgage Loan.

141.     In accordance with the terms of the MLPA and PSA, on September 24, 2010, Special Servicer, on behalf of the Trustee, provided MSMCI with a second written notice of the aforementioned breach of the Environmental Conditions Representation, and again demanded that MSMCI cure the breach or, failing that, repurchase the Mortgage Loan.

142.     By letter dated December 22, 2010, MSMCI again rejected the Trustee's demand and disputed any and all liability to cure the breach or repurchase the Mortgage Loan.

143.     As a direct and proximate result of MSMCI's breach of the Environmental Conditions Representation and MSMCI's refusal to cure the breach or repurchase the Mortgage Loan, MSMCI has committed a material breach of the MLPA.

144.     As a result of MSMCI's material breach of the MLPA, the Trustee and the investors on whose behalf it holds assets have been damaged.

145.     The Trustee has fully performed and fulfilled its obligations under the MLPA and the PSA, including without limitation compliance with the applicable notice provisions of the PSA.

146.    By plain operation of the MLPA, MSMCI is obligated to repurchase the Mortgage Loan.

## SECOND CLAIM FOR RELIEF
### (Breach of the MLPA -- No Material Default Representation)

147.    Plaintiff realleges the foregoing paragraphs of this complaint as if fully set forth herein.

148.    The MLPA and PSA constitute valid contracts supported by valuable consideration.

149.    Plaintiff is the successor in interest to the Morgan Stanley Securitization Depositor under the MLPA.

150.    Pursuant to the No Material Default Representation in the MLPA, MSMCI represented that, to its knowledge, "there exists no material default, breach, violation or event of acceleration" under its Loan Agreement with Borrower.

151.    Contrary to the No Material Default Representation, MSMCI had knowledge of a material default of the Loan Agreement by Borrower at the time it entered into the MLPA.

152.    Therefore, at the time given, the No Material Default Representation was false.

153.    In accordance with the terms of the MLPA and PSA, on September 24, 2010, Special Servicer, on behalf of the Trustee, provided MSMCI with a second written notice of the aforementioned breach of the Environmental Conditions Representation, and again demanded that MSMCI cure the breach or, failing that, repurchase the Mortgage Loan.

154.    By letter dated December 22, 2010, MSMCI again rejected the Trustee's demand and disputed any and all liability to cure the breach or repurchase the Mortgage Loan.

155.    As a direct and proximate result of MSMCI's breach of the No Material Default Representation and MSMCI's refusal to cure the breach or repurchase the Mortgage Loan, MSMCI has committed a material breach of the MLPA.

156.    As a result of MSMCI's material breach of the MLPA, the Trustee and the investors on whose behalf it holds assets have been damaged.

157.    The Trustee has fully performed and fulfilled its obligations under the MLPA and the PSA, including, without limitation, compliance with the applicable notice provisions of the PSA.

158.    By plain operation of the MLPA, MSMCI is obligated to repurchase the Mortgage Loan.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment against MSMCI as follows:

A.    Obligating MSMCI to repurchase the Mortgage Loan in accordance with MLPA;

B.    Awarding Plaintiff money damages in an amount to be determined at trial;

C.    Awarding Plaintiff its costs, fees and expenses (including reasonable attorneys' fees) incurred in connection with MSMCI's failure to observe and perform its obligations to cure the aforementioned breaches or repurchase the Mortgage Loan pursuant to the MLPA; and

D.    Granting such other and further relief as the Court may deem just and proper.

Dated:  New York, New York
          June 30, 2011

                                    Duval & Stachenfeld LLP
                                    Attorneys for Plaintiff


                        By:    _____
                                    Timothy J. Pastore, Esq.
                                    J. Andrew Stephenson, Esq.
                                    Chad A. Naso, Esq.
                                    101 Park Avenue, 11th Floor
                                    New York, New York 10178
                                    Tel. No.:  (212) 883-1700
                                    Fax No.:  (212) 883-8883