UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------- x

THE BANK OF NEW YORK MELLON TRUST      :
COMPANY, NATIONAL ASSOCIATION, TRUSTEE      :
FOR THE REGISTERED CERTIFICATE HOLDERS OF   :
MORGAN STANLEY CAPITAL I INC.,      :
COMMERCIAL MORTGAGE PASS-THROUGH      :
CERTIFICATES SERIES 2007-IQ14, ACTING BY AND   :
THROUGH C-III ASSET MANAGEMENT LLC, AS      :
SPECIAL SERVICER,      :   11 Civ. 0505 (CM)(GWG)
     :
               Plaintiff,      :
     :
        -against-      :
     :
MORGAN STANLEY MORTGAGE CAPITAL, INC.,      :
     :
               Defendant.      :

---------------------------------------------------------------------- x

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
## <u>MOTION FOR SUMMARY JUDGMENT</u>

**Duval & Stachenfeld LLP**
**101 Park Avenue, Eleventh Floor**
**New York, New York 10178**
**Attorneys for Plaintiff**

# <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ......................................................................................... 1

STATEMENT OF FACTS ................................................................................................. 3

    The Mortgage Loan, MLPA and PSA ........................................................................ 3

    The Mortgage Property ............................................................................................... 4

    The Persistent and Unabated Methane Problems at the Mortgaged Property ........... 5

    The Two Express Contractual Warranties Breached by Defendant ........................... 7

    Defendant's Breach of the Environmental Warranty ................................................. 9

    Defendant's Breach of the No Material Default Warranty ....................................... 16

    Defendant's Obligation to Repurchase the Mortgage Loan ..................................... 16

ARGUMENT .................................................................................................................... 17

    A.  THE LEGAL STANDARD FOR SUMMARY JUDGMENT ........................... 17

    B.  MSMCI BREACHED THE ENVIRONMENTAL WARRANTY AND
         THE NO MATERIAL DEFAULT WARRANTY IN THE MLPA ................... 18

        1.  MSMCI's Breach of the Environmental Warranty ..................................... 19

            a.  MSMCI Had Knowledge of Material and Adverse Environmental
               Conditions .......................................................................................... 20

            b.  The Environmental Report Failed to Disclose The Material and
               Adverse Methane Problems at the Wal-Mart Store ........................... 21

        2.  MSMCI's Breach of the No Material Default Warranty ............................. 22

    C.  MSMCI IS OBLIGATED TO REPURCHASE THE MORTGAGE LOAN
         UNDER THE TERMS OF THE MLPA AND PSA ......................................... 22

        1.  MSMCI's Breaches Materially and Adversely Affected the Value of
            the Mortgage Loan ..................................................................................... 23

        2.  The Borrower Defaulted and the Mortgage Loan Became a Specially
            Serviced Mortgage Loan After Wal-Mart Closed its Store for Business ... 25

CONCLUSION ................................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

**Page**

**CASES**

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)..................................................................................................17, 18

*Bank of Am. Corp. v. Lemgruber,*
    385 F. Sup. 2d 200 (S.D.N.Y. 2005)............................................................................ 18-19

*CBS Inc. v. Ziff-Davis Publ'g Co.,*
    75 N.Y.2d 496 (N.Y. 1990) .........................................................................................19, 23

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986).............................................................................................................17

*Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.,*
    275 F.3d 168 (2d Cir. 2004)...............................................................................................18

*In the matter of Tristream East Texas, LLC,*
    USEPA Docket No. CAA-06-2012-330 ..............................................................................4

*Korea Life Ins. Co. v. Morgan Guar. Trust Co. of N.Y.,*
    269 F. Supp. 2d 424 (S.D.N.Y. 2003)...............................................................................17

*Lang v. Ret. Living Publ'g Co.,*
    949 F.2d 576 (2d Cir. 1991)...............................................................................................18

*LaSalle Bank Nat'l Ass'n v. CAPCO Am. Securitization Corp.,*
    2005 WL 3046292 (S.D.N.Y. Nov. 14, 2005) ............................................................23, 24

*Lasalle Bank Nat'l Ass'n v. Lehman Bros. Holdings,*
    237 F. Supp. 2d 618 (D. Md. 2002) ..............................................................................19, 24

*LaSalle Bank Nat. Ass'n v. Merrill Lynch Mortg. Lending, Inc.,*
    2007 WL 2324052 (S.D.N.Y. Aug. 13, 2007)..................................................................18

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986)............................................................................................................17

*Metromedia Co. v. Fugazy,*
    983 F.2d 350 (2d Cir. 1992)...............................................................................................19

*Metromedia Co. v. Fugazy,*
    753 F. Supp. 93 (S.D.N.Y. 1990).......................................................................................19

*Promuto v. Waste Mgmt., Inc.,*
    44 F. Supp. 2d 628 (S.D.N.Y. 1999)..................................................................................18

*Rein v. CAB E. LLC,*
    2009 WL 1748905 (S.D.N.Y. Jun. 22, 2009) ....................................................................18

*State of Ohio, ex rel. v. McGill Property Group, LLC, et. al.,*
    Court of Common Pleas, Cuyahoga County, Ohio, Index No. CV 08 664197 ..................7

*Seiden Assoc. Inc. v. ANC Holdings, Inc.,*
    959 F.2d 425 (2d Cir. 1992).............................................................................................18

## RULES AND REGULATIONS

Fed. R. Civ. P. 56(c) .............................................................................................................17

Fed. R. Civ. P. 56(e) .............................................................................................................18

Plaintiff The Bank of New York Mellon Trust Company, National Association (hereinafter the "Trustee" or "Plaintiff"), as trustee for the registered certificate holders of Morgan Stanley Capital I Inc., Commercial Mortgage Pass-Through Certificates Series 2007-IQ14 (the "Trust"), acting by and through C-III Asset Management LLC, as Special Servicer (the "Special Servicer"), by its attorneys Duval & Stachenfeld LLP, respectfully submits this memorandum of law, the Declaration of Timothy J. Pastore, dated September 21, 2012, with the exhibits attached thereto (cited herein as "Ex. __"), and the Local Civil Rule 56.1 Statement of Material Facts in support of its motion for summary judgment on Plaintiff's claims pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

This case is part and parcel of the efforts by an originator of a mortgage loan to evade liability for clear material breaches of express representations and warranties respecting the nature and quality of a mortgage loan (and the underlying mortgaged property) thereby denying investors in a commercial mortgaged-backed securities offering the benefits of their contractual bargain.

Morgan Stanley Mortgage Capital, Inc. ("MSMCI" or "Defendant") originated the loan at issue here (the "Mortgage Loan") and then, pursuant to a Mortgage Loan Purchase Agreement, dated as of May 1, 2007 (the "MLPA"), sold it, along with other commercial mortgage loans, to Morgan Stanley Capital I, Inc. (the "Morgan Stanley Securitization Depositor").

Under a Pooling and Servicing Agreement (the "PSA"), dated as of May 1, 2007, the Morgan Stanley Securitization Depositor then transferred this pool of loans into a multi-billion dollar trust (the "Trust"), established to hold the loans for the benefit of certificateholders (i.e., investors).  The Trust then issued certificates to the Morgan Stanley Securitization Depositor, which sold the certificates to an underwriting syndicate for eventual resale to investors.

1

In connection with MSMCI's sale of the Mortgage Loan -- which loan is secured by a shopping center property built on top of two former landfills (the "Mortgaged Property") -- MSMCI made express representations and warranties in the MLPA respecting the Mortgage Loan and the Mortgaged Property, and furthermore undertook an express obligation to either cure or repurchase the Mortgage Loan in the event its representations and warranties were false.

Specifically, to induce the inclusion of the Mortgage Loan in the securitization transaction, MSMCI expressly warranted that it had no knowledge of any "material and adverse environmental condition or circumstance affecting [the Mortgaged] Property that was not disclosed in [the Environmental Report]" (the "Environmental Warranty").

This warranty was false when made because MSMCI was well aware that methane -- at explosive levels -- was migrating from the landfills into the Wal-Mart store at the Mortgaged Property. The persistent and unabated migration of methane into the structures caused Wal-Mart -- the largest tenant at the Mortgaged Property -- to close its store for at least two days in December 2006 due to concerns over the health and safety of its employees and customers. Thereafter, Wal-Mart complained repeatedly about the methane problems over a period of months leading up to and after the time when MSMCI made the Environmental Warranty.

Although the MSMCI originator of the Mortgage Loan, Ivan Yee, made clear to his MSMCI colleagues that he did not "think [MSMCI] should send any environmental reports without" including disclosure of the Wal-Mart methane problems, nowhere in the Environmental Report referenced in the Environmental Warranty is there any mention of the persistent migration of methane at the Wal-Mart store.

Similarly, MSMCI expressly warranted that to its knowledge "there exists no material default . . . (and no event which, with the passage of time or giving of notice, or both, would constitute [a material default]) under the documents evidencing or securing the Mortgage

Loan . . . " (the "No Material Default Warranty"). This warranty was also false when made because MSMCI was well aware that Borrower was in default of the Loan Agreement for falsely representing therein that there was no default under the Wal-Mart lease.

MSMCI's false representations and warranties were "Material Breaches" under the MLPA. Indeed, as a result of the persistent migration of dangerous levels of methane into the Wal-Mart store and the failure of Borrower to cure other construction defects at the Wal-Mart store, Wal-Mart ultimately was forced to close its store permanently, vacate the Property and terminate its lease. The departure of the largest and key tenant at the Mortgaged Property had a material and adverse effect on the value of the Mortgage Loan. Shortly after closure of the Wal-Mart store, Borrower defaulted on its payment obligations under the Mortgage Loan -- resulting in a "Servicing Transfer Event" under the PSA and making the Mortgage Loan a "Specially Serviced Mortgage Loan" within the definition of "Material Breach" under the MLPA and PSA.

Plaintiff provided notice to MSMCI of the Material Breaches and an opportunity to cure or repurchase the Mortgage Loan in accordance with the MLPA. MSMCI, however, has refused to do so. There is no genuine dispute as to the material facts in this case and therefore Plaintiff is entitled to summary judgment as a matter of law.

## STATEMENT OF FACTS

### The Mortgage Loan, MLPA and PSA

On or about December 29, 2006, pursuant to a written Loan Agreement (the "Loan Agreement"), MSMCI made the Mortgage Loan in the amount of $81,000,000 to City View Center, LLC ("Borrower") in connection with Borrower's purchase of a retail shopping center in Garfield Heights, Ohio (the "Mortgaged Property") from Garfield Land Development, LLC ("Garfield"). (Ex. 1).

Thereafter, MSMCI sold the Mortgage Loan to the Morgan Stanley Securitization Depositor pursuant to the MLPA, dated as of May 1, 2007. (Ex. 2). Pursuant to the PSA, also dated as of May 1, 2007, the Morgan Stanley Securitization Depositor created the Trust to hold a pool of securitized loans -- one of which was the Mortgage Loan. (Ex. 3). Under the PSA, the Trustee (Plaintiff in this case) is the successor in interest to the rights of the Morgan Stanley Securitization Depositor under the MLPA. (Ex. 3, § 2.1; Ex. 4, ¶ 12).

**The Mortgaged Property**

The Mortgaged Property is constructed on top of portions of two former municipal solid waste landfills. (Ex. 5 at MSMC0048413). There were environmental conditions associated with the former landfills, and, as such, the construction of the Mortgaged Property was regulated by the Ohio Environmental Protection Agency ("OEPA") under a "Rule 13 Authorization." (Id.). In particular, the Mortgaged Property was required to be constructed in a manner to prevent the migration of harmful landfill gas (a major component of which is methane) generated by the waste material that remained underneath the Mortgaged Property. (Ex. 6).

As documented in the Phase I Environmental Site Assessment, prepared for Borrower by HzW Environmental Consultants LLC ("HzW"), dated November 2006 (the "HzW Report") -- a report that was not disclosed to Plaintiff prior to securitization of the Mortgage Loan -- OEPA had reported that "methane generation is the agency's primary concern" at the Mortgaged Property. (Ex. 6 at 40). Methane is a highly flammable and explosive substance and has been identified by the United States Environmental Protection Agency ("USEPA") as an "extremely hazardous substance" under Section 112(r) of the Clean Air Act. See In the matter of Tristream East Texas, LLC, USEPA Docket No. CAA-06-2012-330 (Ex. 37).

To control and prevent the migration of methane into the buildings and structures at the Mortgaged Property, OEPA required the construction of a clay cap on top of the waste material

and the installation of a flexible membrane liner underneath the concrete slabs of the buildings. (Ex. 6). As an added precaution, "the structures were designed with methane sensors, alarms and a gas extraction system to remove methane from beneath the structures, if necessary." (Ex. 5, at MSMC00048413).

**The Persistent and Unabated Methane Problems at the Mortgaged Property**

At the time of securitization of the Mortgage Loan, the Mortgaged Property was anchored by Wal-Mart -- the largest tenant at the Mortgaged Property. (Ex. 4, ¶¶ 37, 40). Shortly after opening its 147,027 square-foot store and prior to the securitization of the Mortgage Loan, Wal-Mart began to experience the intrusion of methane at dangerous and explosive levels into its store. On October 31, 2006, the Garfield Heights Fire Department ("GHFD") responded to a methane alarm at the Wal-Mart store and discovered explosive levels of methane at 100% of the lower explosive level ("LEL") in the ambient air within the Wal-Mart store. (Id.).

This was not an isolated incident. The methane problems at Wal-Mart were persistent and unabated at the time the Mortgage Loan was transferred by MSMCI to the Trust. Indeed, between December 2006 (when the Mortgage Loan was made) and May 2007 (when the Mortgage Loan was securitized), there were numerous written complaints concerning the methane problems at the Wal-Mart store including, but not limited to:

- On December 14, 2006, counsel for Wal-Mart sent a notice of default under its lease stating: "[E]levated and unsafe levels of methane were detected within the Wal-Mart store . . . . This situation is urgent and required Wal-Mart to temporarily close the store to protect public health. . . . [This] default is materially and adversely affecting Wal-Mart's ability to conduct normal business operations." (Ex. 8).

- On December 28, 2006, in a tenant estoppel certificate specifically addressed to MSMCI (as the then prospective lender), Wal-Mart repeated the circumstances of the default cited in its December 14, 2006 notice of default (above) stating: "Methane was detected in the store at levels above 100% of the lower explosive level, which required temporary closure of the store for two days from December 5-7, 2006….Wal-Mart reserves its rights and remedies under the Lease, including, but not

5

limited to, its right to withhold or abate rent to address damages incurred by Wal-Mart that have arisen from the situation." (Ex. 9).

- Also on December 28, 2006, Garfield (the then-owner of the Mortgaged Property) confirmed: "[M]ethane gas intrusion [was] identified in November and December, 2006 at the above-captioned Wal-Mart store location. Methane was detected in the store at levels above 100% of the lower explosive level. . . ." (Ex. 10).

- On January 8, 2007 (only days after MSMCI closed the Mortgage Loan), counsel for Wal-Mart again wrote: "[A]dditional notice concerning elevated levels of methane above 100% of the lower explosive level (LEL) which were detected on Wednesday, January 3, 2007 by Alemko, the jointly appointed monitoring company." (Ex. 11).

- On February 23, 2007, Wal-Mart again raised its concerns regarding the on-going and unabated methane problems at its store: "I want to reiterate there are numerous structural problems at the  . . . . [Wal-Mart store] resulting most notably in spiking levels of methane intrusion in our store . . .  methane was detected at the floor drains in the pharmacy water closet and water heater closet . . . the cap in the pharmacy drain appears to be cracked and is allowing methane to enter our store. . . . At this point it appears the past attempts at remediation are not working and this causes us concern.  These structural issues underlying the methane intrusion into our store need to be remedied immediately." (Ex. 12) (The first page of Ex. 12 indicates that the February 23, 2007 letter from Wal-Mart was sent to Ivan Yee of MSMCI by e-mail on March 7, 2007).

- On March 23, 2007, counsel for Wal-Mart yet again raised the on-going and unabated methane problems at the Wal-Mart store: "Wal-Mart's consultant indicates that positive [methane] readings are still being noticed at several floor drains.  There is evidence that the floor drain repairs have not proved to be a permanent fix and pipes continue to separate and sag. . . . The temporary fix that has been implemented by Neptune Plumbing is not working, as many drains are having to be plugged with expansion plugs due to explosive levels of methane again being detected." (Ex. 13).

- On April 6, 2007, Wal-Mart wrote in a letter to the manager of the Mortgaged Property: "Every day this week methane has been detected at [the Wal-Mart] store. . . . At this point it appears that the past attempts at remediation are not working and this causes us concern." (Ex. 14).

The cause of the methane problems at the Wal-Mart store can be traced to methane from the landfills migrating through the clay cap and the settlement of the landfills.   Methane migrating through the clay cap collected in the structural fill underneath the Wal-Mart store. (Ex. 15 at 14).  As the waste material underneath the Mortgaged Property settled, the sanitary

sewer lines underneath the Wal-Mart store began to sag and separate, causing a pathway for the methane in the structural fill to escape into the floor drains at the Wal-Mart store.  (Id. at 13-14). As MSMCI's own environmental engineering expert (Dr. Robert Powell) opined, landfill settlement resulted in a "systematic failure of the cast iron plumbing system" underneath the Wal-Mart store.  (Id. at 15).  This was "not an isolated incident."  (Id.).   Indeed, the piping separation problems at the Wal-Mart store began in October 2006 and continued through August 2008.  (Ex. 15 at 14-15, 17-18; see also Ex. 16).

Not too long after the Mortgage Loan was securitized, methane intrusion became prevalent throughout the sanitary sewer and storm drain system at the Mortgaged Property.  This led to, among other things:  a methane fire within the storm sewer at the Mortgaged Property (Ex. 17); numerous notices of violation issued by OEPA (Ex. 18); state and federal agency involvement (OEPA, USEPA and the Agency for Toxic Substances and Disease Registry) (Ex. 19); and ultimately a State of Ohio lawsuit, State of Ohio, ex rel. v. McGill Property Group, LLC, et. al., Court of Common Pleas, Cuyahoga County, Ohio, Index No. CV 08 664197, and a consent order to address certain remedial measures necessary to abate the threat to public health and safety created by these methane intrusion problems at the Mortgaged Property.  (Ex. 20).

Ultimately, Wal-Mart closed its store to business in September 2008 (Ex. 16) and terminated its lease in January 2009 (Ex. 21) citing safety concerns relating to landfill gas intrusion at the Wal-Mart store and at other locations throughout the Mortgaged Property.

**The Two Express Contractual Warranties Breached by Defendant**

The MLPA contained express representations and warranties made by MSMCI.  Under the Environmental Warranty, MSMCI expressly warranted that MSMCI had "no knowledge of any material and adverse environmental condition or circumstance affecting [the Mortgaged Property] that was not disclosed in the [Environmental Report]."  (Ex. 2 at P 033667-68,

Representation 12(i)).  The "Environmental Report" referred to in the Environmental Warranty made no mention of the methane problems (known by MSMCI) at the Wal-Mart store.

Under the No Material Default Warranty, MSMCI expressly warranted that, to its knowledge, "there exists no material default, breach, violation or event of acceleration (and no event which, with the passage of time or giving of notice, or both, would constitute any of the foregoing) under the documents evidencing or securing the Mortgage Loan, in any such case to the extent that same materially and adversely affects the value of the Mortgage Loan and the related Property . . . ." (Ex. 2, P 033672-73, Representation 27).   Contrary to this Warranty, MSMCI knew that Borrower was in default of the Loan Agreement as a result of Borrower falsely representing therein that there was no default under the Wal-Mart lease.  (Ex. 1, § 3.1.22: "[T]here are no defaults [under the Leases identified on Schedule I to the Loan Agreement, which includes the Wal-Mart Lease] by either party [to each scheduled lease].")

The Environmental Warranty and the No Material Default Warranty were made by MSMCI to the Morgan Stanley Securitization Depositor under the MLPA (Ex. 2), and were assigned to the Trustee, as if they were made by MSMCI directly to the Trustee, pursuant to the PSA.  (Ex. 3, § 2.1(a); Ex. 2, §§ 4(a) & 5(a); Ex. 4, ¶¶ 13, 14).  Moreover, these Warranties were not limited in any way by any due diligence (or lack thereof) or knowledge of the Trustee independent of what was expressly disclosed in the Environmental Report.  In particular, Section 3 of the MLPA expressly provides:  "The fact that the Purchaser [the Trust] has conducted or has failed to conduct any partial or complete examination of the credit files, underwriting documentation or Mortgage Files for the Mortgage Loans shall not affect the right of the Purchaser [the Trust] or the Trustee to cause the Seller [MSCMI] to cure any Material Document Defect or Material Breach . . . or to repurchase or replace the defective Mortgage Loans pursuant to Section 5 of this Agreement."  (Ex. 2, § 3).

**Defendant's Breach of the Environmental Warranty**

1.  *Defendant's Knowledge of Material and Adverse Environmental Conditions or Circumstances.*

MSMCI was well aware of the methane problems at the Wal-Mart store prior to closing

on the Mortgage Loan in December 2006 and before the transfer of the Mortgage Loan to the

Trust in May 2007.  Indeed, in the tenant estoppel certificate from Wal-Mart to MSMCI, dated

December 28, 2006, Wal-Mart specifically informed MSMCI of the methane problems at the

Wal-Mart store:

> Methane was detected in the store at levels above 100% of the lower explosive level, which required a temporary closure of the store for two days from December 5-7, 2006.  There is no conclusive determination to date as the cause of the methane in the store.  Wal-Mart reserves its rights and remedies under the Lease, including but not limited to, its right to withhold or abate rent to address damages incurred by Wal-Mart that have arisen from the situation.

(Ex. 9).  These facts, along with the methane intrusion that occurred in or around November

2006, were reiterated in a letter agreement (also known as the lease warranty undertaking) from

Garfield (the then-landlord of the Mortgaged Property) to Wal-Mart, dated December 28, 2006 --

a copy of which letter agreement was also received by MSMCI prior to closing on the Mortgage

Loan. (Ex. 10; Ex. 22, Eckes Dep. at 98-100).

Upon receiving the tenant estoppel certificate directly from Wal-Mart (and thereby

learning that a default existed under the Wal-Mart lease), various personnel at MSMCI (Kristin

Sansone, James Chung, Ivan Yee and Robert Demchak) exchanged a flurry of e-mails discussing

in detail the methane intrusions at Wal-Mart and the two-day store closure.  (Ex. 23).  Among

other things, MSMCI's Head of Underwriting, Kristin Sansone, stated in e-mails: "Wal-Mart is

going to take action against the [then landlord]" (Ex. 23 at MSMC0031642) and "clearly the

Wal-Mart problem will highlight the fact that we have environmental problems." (Ex. 23 at

MSMC0031641).

MSMCI was also well aware that the methane problems that occurred at the Wal-Mart store in the fall of 2006 were not isolated incidents.  In her deposition, Cynthia Eckes (MSMCI's Rule 30(b)(6) witness), admitted that MSMCI had received, prior to making the Environmental Warranty in the May 2007 MLPA, a copy of Wal-Mart's February 23, 2007 letter in which Wal-Mart again raised the urgency of the on-going methane problems at its store:

> I want to reiterate there are numerous structural problems at the above mentioned location resulting most notably in spiking levels of methane intrusion in our store. Specifically, as we discussed, methane was detected at the floor drains in the pharmacy water closet and water heater closet.  We also discussed that the cap in the pharmacy drain appears to be cracked and is allowing methane to enter our store. . . . We expect you to take steps immediately to stop methane from entering our store at those locations.  At this point it appears the past attempts at remediation are not working and this causes us concern.  These structural issues underlying the methane intrusion into our store need to be remedied immediately.

(Ex. 12 (The first page of Ex. 12 indicates that the February 23, 2007 letter from Wal-Mart was sent to Ivan Yee of MSMCI by e-mail on March 7, 2007.); Ex. 22, Eckes Dep. at 198).

MSMCI was also well aware that the methane problems at the Wal-Mart store were material and adverse environmental conditions.  In connection with the contemplated securitization of the Mortgage Loan, MSMCI prepared a detailed description of the Mortgage Loan for B-piece investors (i.e., the most subordinate class of certificateholders who take a "first loss" position in exchange for a higher yield on their investment) called an Asset Summary Report ("ASR").  (Ex. 24; Ex. 25, Chung Dep. at 138).  In the "Environmental Issues" section of the March 19, 2007 ASR, MSMCI specifically disclosed to the B-piece investors, among other things, that: (a) elevated levels of methane were detected in the Wal-Mart store in December 2006, (b) the Wal-Mart store was closed for two days as a result of the methane intrusion, and (c) Wal-Mart had alleged continued methane intrusions in its store in February 2007.  (Ex. 24 at P 002312).

When asked why the Wal-Mart methane intrusion problems and store closure were expressly included in the ASR, Ms. Sansone of MSMCI testified:   "I thought it was important that the ASR include a discussion of what happened at Walmart … it was an important point to make to any potential investors."  (Ex. 26, Sansone Dep. at 150; see also Ex. 27, Yee Dep. at 183 (it was important "[t]o disclose to the potential investor…that it happened"); Ex. 25, Chung Dep. at 158 ("I thought it was important to tell him that." (referring to a disclosure made to a prospective B-piece investor about the Wal-Mart methane leak and resulting store closure))). Ms. Eckes added that the Wal-Mart methane problems were disclosed in the ASR because they related to a "relevant environmental issue."  (Ex. 22, Eckes Dep. at 214).

Ms. Sansone and her colleagues at MSMCI were correct -- the Wal-Mart methane problems were, in fact, quite important and material to B-piece investors.  So much so that two potential B-piece investors -- JER Partners L.L.C. ("JER") and LNR Property LLC ("LNR") -- demanded that MSMCI remove the Mortgage Loan from two different securitization pools because of the methane problems at the Wal-Mart store.

In particular, Keith Belcher of JER wrote to James Chung and William Sampson of MSMCI expressing JER's concerns about the environmental conditions at the Wal-Mart store, including the two-day store closure:

> Our site inspection indicated that the property was recently reported to have had methane gas levels that forced Walmart to close briefly.  Additionally feedback indicated that the prior owner/developer was motivated to sell because of continuing difficulties with the State regarding the environmental issues.  We recognize there is borrower equity and environmental insurance, however, the potential decline in value related to the possible methane problems is greater than the insurance.  This center has no operating history and while well leased, the unproven nature of the center, the potential environmental issues (real or the public stigma) and concerns over the potential settlement of the buildings, makes this a very high risk loan.

(Ex. 28) (emphasis added).

Based on the Wal-Mart methane concerns raised by JER, MSMCI removed the Mortgage Loan from the securitization pool known as HQ-11. (Ex. 22, Eckes Dep. at 161; Ex. 25, Chung Dep. at 147). And after the Mortgage Loan was removed by MSMCI from HQ-11, JER invested in the B-piece of HQ-11. (Ex. 22, Eckes Dep. at 161; Ex. 25, Chung Dep. at 147).

Having lost the chance to dispose of the Mortgage Loan through HQ-11 due to the risks posed by the environmental conditions at Wal-Mart, MSMCI immediately sought to include the Mortgage Loan in a separate securitization pool known as IQ-13. (Ex. 22, Eckes Dep. at 161, 163; Ex. 25, Chung Dep. at 151-52). The prospective B-piece investor for that pool of loans was LNR. (Ex. 22, Eckes Dep. at 161, 163; Ex. 25, Chung Dep. at 151-52). LNR, like JER before it, also demanded that MSMCI remove the Mortgage Loan from the pool of loans in IQ-13. (Ex. 22, Eckes Dep. at 188-89; Ex. 25, Chung Dep. at 162). In an e-mail, dated March 1, 2007, William Sampson of MSMCI described LNR's decision: "They don't want City View. If maybe more time had passed since the WalMart issue, without a similar incident, they could get comfortable. But they are worried about the possibility of WalMart leaving." (Ex. 29).

The next day, Mr. Sampson sent another e-mail (to a larger group of his colleagues at MSMCI) again describing LNR's decision to reject the Mortgage Loan from IQ-13:

> City View – All environmental, of course. They do not want the loan in the deal. <u>This seems driven by the Wal-Mart shut down. They are worried it will happen again, Wal-Mart will abandon the store, and the center will then decline.</u>

(Ex. 30) (emphasis added). (LNR's prediction, of course, became reality: Wal-Mart abandoned its store citing safety concerns relating to methane and the Mortgaged Property declined in value. (Exs. 16 & 21)). Ultimately, after the Mortgage Loan was removed by MSMCI from IQ-13, LNR invested in the B-piece of IQ-13. (Ex. 25, Chung Dep. at 164-5; Ex. 22, Eckes Dep. at 192). After JER and LNR demanded that MSMCI remove the Mortgage Loan from HQ-11 and

IQ-13, respectively, MSMCI sought to and did securitize the Mortgage Loan in the Trust at issue

in this case (IQ-14).  (Ex. 25, Chung Dep. at 168-69).

2.  *The Material and Adverse Environmental Conditions or Circumstances Known to MSMCI Were Not Disclosed in the Environmental Report.*

The "Environmental Report" referenced in the Environmental Warranty is the Phase I

Environmental Site Assessment, prepared by IVI Due Diligence Services, Inc. ("IVI"), dated

July 25, 2006 (the "Environmental Report").  (Ex. 5).   Despite MSMCI's knowledge of the Wal-

Mart methane problems, nowhere in the Environmental Report is there any disclosure of the

material and adverse environmental conditions that persisted at the Wal-Mart store prior to

securitization of the Mortgage Loan in May 2007. Id.  In fact, Wal-Mart -- the largest tenant at

the Mortgaged Property -- is not even mentioned at all in the Environmental Report.  Id.

Ivan Yee recognized this material omission in the Environmental Report when he wrote

to his colleagues at MSMCI on March 16, 2007 stating, "we may also have a new report done by

IVI regarding the Wal-Mart issue as well.  I don't think we should send any of the environmental

reports without it."  (Ex. 31) (emphasis added).  Despite this, the Environmental Report was

never updated to disclose any of the methane problems at the Wal-Mart store.

The likely reason why the methane problems at the Wal-Mart store are absent from the

Environmental Report in the first place is because the Phase I environmental site assessment of

the Mortgaged Property was performed and completed by IVI more than three months before the

methane problems at the Wal-Mart store first materialized.  As indicated in the Environmental

Report, IVI performed the site visit of the Mortgaged Property on July 14, 2006 and issued the

Environmental Report (originally to LaSalle Bank -- a prior prospective lender to Borrower) on

July 25, 2006.  (Ex. 5 at 3).  Rather than retain IVI to perform a contemporaneous Phase I

environmental site assessment and a new site visit of the Mortgaged Property, MSMCI, in the

fall of 2006, requested IVI to "readdress" to Morgan Stanley the IVI Phase I environmental site assessment report prepared for LaSalle Bank in July 2006.  (Ex. 32; Ex. 22, Eckes Dep. at 53-4). As a consequence, at the time the Environmental Warranty was made in May 2007, the Environmental Report did not contain or disclose current information regarding the then-known material and adverse environmental conditions affecting the Mortgaged Property.

This fact is illustrated by the text of the Environmental Report.  Aside from the lack of any mention of the Wal-Mart methane problems, the Environmental Report contains other outdated information regarding environmental conditions at the Mortgaged Property.  For example, in section 4.6 of the Environmental Report, IVI highlights that "Ms. Naples [of OEPA] further stated there are no outstanding violations at the Subject [Mortgaged Property]."  (Ex. 5, § 4.6).  While this might have been true at the time IVI conducted the Phase I environmental site assessment in July 2006, it was not the case at the time MSMCI retained IVI to readdress the Environmental Report, and it was false at the time Morgan Stanley made the Environmental Warranty in May 2007.  (See Ex. 6 at MSMC0031471).

As indicated by the HzW Report (which was prepared for Borrower in October/November 2006, shortly before the Mortgage Loan was made), HzW's conversations with OEPA revealed that the Mortgaged Property "was in active enforcement and 'could be' for some time to come" and that "both [OEPA] DSIWM and the Division of Surface Water had initiated enforcement actions."  (Id.).  In addition, according to Ms. Judy Bowman at OEPA, "methane generation is the agency's primary concern" at the Mortgaged Property.  (Id.).  Ms. Bowman informed HzW that there were "problems" with "the placement of the liner underneath the site to block methane migration" and problems with the "placement of the methane collection system underneath building pads and parking areas."  (Id.).  According to HzW, Ms. Karen

14

Naples of OEPA (the same person IVI had apparently spoken with in July 2006) "reiterated some of the same items relayed by Ms. Bowman."  (Id.).

None of this, of course, is disclosed in the Environmental Report.  The Environmental Report does not even identify, as an "item of environmental concern" or otherwise, that methane from the former landfills could potentially enter the structures at the Mortgaged Property.  Quite the contrary, the Environmental Report suggests that methane is not a problem at the Mortgaged Property because, according to IVI, methane is controlled by certain improvements and preventative measures made during construction of the Mortgaged Property.  (Ex. 5 at MSMC0048413).  For example, the Environmental Report identifies as an "item of environmental concern" that the Mortgaged Property was a former landfill site, but that the Mortgaged Property "will meet the closure requirements under [OEPA] Rule 13, which includes capping the landfill and installing a methane gas extraction system."  (Id.).  The Environmental Report goes on to state that "[a] gas extraction system was installed beneath the current improvement [and that] [t]he structures were designed with methane sensors, alarms and a gas extraction system to remove methane from beneath the structures, if necessary."  (Id.) (emphasis added).  Based on these statements, IVI apparently concluded that, despite the fact that the Mortgaged Property was constructed on top of former landfills, there was no risk of methane intrusion into the buildings at the Mortgaged Property because there were sufficient controls in place to prevent methane from escaping into the structures at the Mortgaged Property.  Again, IVI may have believed this to be true at the time it performed its Phase I environmental site assessment in July 2006, but, as MSMCI was well aware, it certainly was not true at the time MSMCI made the Environmental Warranty in May 2007.

**Defendant's Breach of the No Material Default Warranty**

MSMCI was aware that the facts represented in the No Material Default Warranty were false when made. Prior to the closing of the Mortgage Loan and the subsequent loan sale under the MLPA, Wal-Mart asserted lease defaults relating to the methane gas intrusion and certain construction defects. (Exs. 8-14). The first written notice of default was issued by Wal-Mart on December 14, 2006 -- prior to the closing on the Mortgage Loan (Ex. 8) -- and was followed by repeated notices of default issued by Wal-Mart prior to the time of securitization of the Mortgage Loan. (Exs. 9, 11-14). MSMCI knew of the default under the Wal-Mart lease by virtue of the tenant estoppel certificate issued by Wal-Mart directly to MSMCI on December 28, 2006. (Ex. 9). This default remained uncured at the time of the closing of the Mortgage Loan (as evidenced by the fact that Wal-Mart sent a letter on January 8, 2007 (days after the closing of the Mortgage Loan) again complaining of the uncured problem (Ex. 11)). Months later, when MSMCI made the No Material Default Warranty, it knew that Borrower's default under the Wal-Mart lease was uncured (see Ex. 12 -- which was sent directly to MSMCI on March 7, 2007) -- thereby making Borrower's representation under the Loan Agreement that there was no default under the Wal-Mart lease and MSMCI's representations in the No Material Default Warranty false.

**Defendant's Obligation to Repurchase the Mortgage Loan**

MSMCI's breaches of the Environmental Warranty and the No Material Default Warranty were each a "Material Breach" as defined by the MLPA and PSA. Under the MLPA and PSA, a "Material Breach" occurs when (1) the breach "materially and adversely affects the value of the Mortgage Loan" and (2) the Mortgage Loan becomes a "Specially Serviced Mortgage Loan." (Ex. 2, § 5(b); Ex. 3, § 2.3).

As a result of the persistent and unabated migration of dangerous levels of methane gas into the Wal-Mart store and Borrower's continuous failure to cure the construction defects at the

Wal-Mart store -- both of which commenced <u>prior</u> to the closing on the Mortgage Loan and continued up to (and beyond) the date MSMCI made the Environmental Warranty and the No Material Default Warranty -- Wal-Mart (the anchor tenant at the Mortgaged Property) was forced to close its store at the Mortgaged Property permanently and terminate its lease. (Exs. 16 & 20). The methane intrusion, construction defects and departure of the anchor tenant from the Mortgaged Property had a material and adverse effect on the value of the Mortgage Loan. Indeed, shortly after Wal-Mart closed its store, Borrower defaulted on it payment obligations under the Mortgage Loan and, as a result, the Mortgage Loan became a "Specially Serviced Mortgage Loan," as defined by the MLPA and PSA, on November 12, 2008. (Ex. 33). In accordance with the MLPA, MSMCI was provided written notices of its Material Breaches and, having failed to cure those breaches, MSMCI is required to repurchase the Mortgage Loan in accordance with the MLPA. (Ex. 34).

## <u>ARGUMENT</u>

### A.    <u>THE LEGAL STANDARD FOR SUMMARY JUDGMENT</u>

Summary judgment is appropriate where the evidence shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). Once the party seeking summary judgment has shown the absence of a genuine issue of material fact, the party opposing the motion for summary judgment "must raise more than just 'metaphysical doubt as to the material facts.'" <u>Korea Life Ins. Co. v. Morgan Guar. Trust Co. of N.Y.</u>, 269 F. Supp. 2d 424, 435 (S.D.N.Y. 2003) (quoting <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986)). Moreover, "[f]actual disputes that are irrelevant or unnecessary will not be counted." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). Rather, the opposing party must present specific evidence in support of its contention that there is a genuine dispute as

to material facts. Rein v. CAB E. LLC, 2009 WL 1748905, *2 (S.D.N.Y. Jun. 22, 2009);

LaSalle Bank Nat'l Ass'n v. Merrill Lynch Mortg. Lending, Inc., 2007 WL 2324052, at *7

(S.D.N.Y. Aug. 13, 2007) (The "mere existence of some alleged factual dispute between the

parties will not defeat an otherwise properly supported motion for summary judgment; the

requirement is that there be no genuine issue of material fact." (quoting Lang v. Ret. Living

Publ'g Co., 949 F.2d 576, 580 (2d Cir. 1991)) (emphasis in original)); see also Fed. R. Civ. P.

56(e); Anderson, 477 U.S. at, 250. Where, as here, a summary judgment motion concerns the

interpretation of a contract, summary judgment may be granted when its words are clear and

unambiguous. Seiden Assoc. Inc. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir. 1992);

Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 275 F.3d 168, 177 (2d Cir.

2004).

Here, the undisputed facts show that MSMCI breached two clear and express warranties

set forth in the MLPA -- the Environmental Warranty and the No Material Default Warranty.

Plaintiff, therefore, is entitled to summary judgment as a matter of law.

## B. MSMCI BREACHED THE ENVIRONMENTAL WARRANTY AND THE NO MATERIAL DEFAULT WARRANTY IN THE MLPA

To prevail on a breach of warranty claim, a plaintiff must simply show: "(1) plaintiff and

defendant entered into a contract; (2) containing an express warranty by the defendant with

respect to a material fact; (3) which warranty was part of the basis of the bargain; and (4) the

express warranty was breached by defendant." LaSalle Bank, 2007 WL 2324052, at *23

(quoting Promuto v. Waste Mgmt., Inc., 44 F. Supp. 2d 628, 642 (S.D.N.Y. 1999)).

Plaintiff need not show that it relied on the truth of the warranted information, but merely

that it relied on the existence of the warranty as part of the contract. Bank of Am. Corp. v.

Lemgruber, 385 F. Sup. 2d 200, 229 (S.D.N.Y. 2005) ("[I]t is not reliance on the truth of the

warranted information but reliance only on the existence of the warranty as part of the sales contract that is necessary to establish a breach of express warranty claim.").

Moreover, "[t]he required reliance is established if, as here, the express warranties are bargained-for terms of the seller." CBS Inc. v. Ziff-Davis Publ'g Co., 75 N.Y.2d 496, 504 (N.Y. 1990). And, as a matter of law, the mere inclusion of a warranty in a "Representations and Warranties" section of a contract establishes that the warranty was part of the bargain reached by the parties. Lasalle Bank Nat'l Ass'n v. Lehman Bros. Holdings, 237 F. Supp. 2d 618, 627, (D. Md. 2002) (applying New York law) (quoting Metromedia Co. v. Fugazy, 983 F.2d 350, 360 (2d Cir. 1992)); see also Metromedia Co. v. Fugazy, 753 F. Supp. 93, 99 (S.D.N.Y. 1990) ("Even if the warranties were not the subject of explicit discussions . . . their inclusion in the written contract establishes that they were part of the bargain.").

Once reliance has been shown, "the right to be indemnified in damages for its breach does not depend on proof that the buyer thereafter believed that the assurances of fact made in the warranty would be fulfilled. The right to indemnification depends only on establishing that the warranty was breached." Ziff-Davis Publ'g Co., 75 N.Y.2d at 503-04 (emphasis added).

### 1.   MSMCI's Breach of the Environmental Warranty

MSMCI expressly warranted that it had "no knowledge of any material and adverse environmental condition or circumstance affecting [the Mortgaged Property] that was not disclosed in the [Environmental Report]." (Ex. 2 at P 033667-68). Contrary to its Environmental Warranty, MSMCI was well aware of material and adverse environmental conditions affecting the Mortgaged Property that were not disclosed in the Environmental Report. MSMCI's failure to disclose these environmental conditions in the Environmental Report is a clear breach of the Environmental Warranty.

### a.  MSMCI Had Knowledge of Material and Adverse Environmental Conditions

It is undisputed that MSMCI knew of material and adverse environmental conditions affecting the Mortgaged Property prior to making the Environmental Warranty.  Indeed, the Wal-Mart methane problem was persistent, unabated and well-documented at the time MSMCI made the Environmental Warranty.  It is undisputed that between December 2006 and the May 2007 securitization of the Mortgage Loan, there were no less than seven separate letters explicitly disclosing the ongoing methane problems at the Wal-Mart store.  (See Exs. 8-14).  By virtue of the Wal-Mart tenant estoppel certificate and the lease warranty undertaking, both dated December 28, 2006 and both received by MSMCI prior to making the Mortgage Loan, MSMCI was explicitly informed of the methane problems at the Wal-Mart store and the Wal-Mart store closure resulting from the methane intrusion.  (Exs. 9 & 10).

MSMCI was also aware that the methane problems at the Wal-Mart store continued after the Mortgage Loan closed and remained unabated prior to the time MSMCI made the Environmental Warranty.  (Exs. 8-14; Ex. 22, Eckes Dep. at 214-18).  MSMCI's own 30(b)(6) witness (Cynthia Eckes) admitted that, prior to making the Environmental Warranty, MSMCI had received a copy of Wal-Mart's February 23, 2007 letter in which Wal-Mart reiterated the urgency of the persistent and unabated methane problems at its store and complained that the past attempts to remediate the methane problems were "not working."  (Ex. 12; Ex. 22, Eckes Dep. at 198).  There is simply no dispute that MSMCI had knowledge of these facts.

Likewise, MSMCI knew that the methane problems at the Wal-Mart store were significant and material.  MSMCI, in fact, admits that the Wal-Mart methane intrusion problems were of such significance that they needed to be disclosed to potential investors.  As MSMCI's Head of Underwriting (Kristin Sansone) testified, the existence of the methane intrusion

problems and the related Wal-Mart store closure were "an important point to make to any potential investors." (Ex. 26, Sansone Dep. at 150). Moreover, Ms. Eckes testified that the Wal-Mart methane problem and related store closure had to be disclosed because they concerned a "relevant environmental issue." (Ex. 22, Eckes Dep. at 214).

The Wal-Mart methane problems were so significant and material that the mere existence of these problems caused not one, but two, separate B-piece investors -- JER and LNR -- to demand MSMCI to remove the Mortgage Loan from two different securitization pools. (Ex. 22, Eckes Dep. at 161, 188-89; Ex. 25, Chung Dep. at 147, 162). According to MSMCI, one of those B-piece investors (LNR) actually predicted that the Wal-Mart methane problems "will happen again, Wal-Mart will abandon the store, and the center will decline." (Ex. 30). This, of course, is exactly what did happen. Based on these concerns, MSMCI ultimately removed the Mortgage Loan from both securitization pools. (Ex. 22, Eckes Dep. at 161, 188-89; Ex. 25, Chung Dep. at 147, 162).

#### b. The Environmental Report Failed to Disclose The Material and Adverse Methane Problems at the Wal-Mart Store

The record clearly demonstrates that, although MSMCI was fully aware of the material and adverse methane problems at the Wal-Mart store prior to making the Environmental Warranty, none of these material and adverse environmental conditions are disclosed in the Environmental Report (contrary to the clear and express Environmental Warranty made by MSMCI). In fact, nowhere in the Environmental Report is there even a reference to Wal-Mart -- the largest tenant at the Mortgaged Property. (Ex. 5).

Yet, MSMCI clearly recognized the importance of disclosing the material and adverse environmental conditions affecting the Wal-Mart store. MSMCI's Ivan Yee went so far as to write his MSMCI colleagues stating that no environmental report should be sent out without the

21

inclusion of Wal-Mart methane issues.  (Ex. 31).  But, in fact, the Environmental Report actually issued and referred to in the Environmental Warranty failed to include this material disclosure. Accordingly, there can be no dispute that MSMCI's failure to disclose in the Environmental Report the methane problems at the Wal-Mart store is an unmistakable breach of the Environmental Warranty.

## 2.    MSMCI's Breach of the No Material Default Warranty

MSMCI was well aware that its representations in the No Material Default Warranty were false when made.  As early as December 28, 2006, prior to the closing of the Mortgage Loan, MSMCI was notified of lease defaults relating to the methane problems at the Wal-Mart store.  (Exs. 9, 11-14).  Indeed, the Wal-Mart tenant estoppel certificate addressed to MSMCI unequivocally advised MSMCI of the methane problems and that Wal-Mart was reserving its "rights and remedies under the Lease, including, but not limited to its right to withhold or abate rent to address damages incurred by Wal-Mart that have arisen from the situation."  (Ex. 9). Indeed, Ms. Eckes testified that MSMCI understood as of December 28, 2006 that Wal-Mart might withhold or abate rent under its lease based on the methane problems at the Wal-Mart store. (Ex. 22, Eckes Dep. at 195).  Despite this, Borrower falsely represented in the Loan Agreement that there was no default under the Wal-Mart lease.  MSMCI, in turn, represented that there was no default under the Loan Agreement -- which it knew to be false because it knew that there was a default under the Wal-Mart lease.  Based on these undisputed facts, it is clear that MSMCI breached the No Material Default Warranty.

## C.    MSMCI IS OBLIGATED TO REPURCHASE THE MORTGAGE LOAN UNDER THE TERMS OF THE MLPA AND PSA

MSMCI's breaches of the Environmental Warranty and the No Material Default Warranty each constituted a "Material Breach" under the terms of the MLPA and PSA and, as

such, MSMCI is required under the MLPA to cure or repurchase the Mortgage Loan. (Exs. 2 &
3); see also LaSalle Bank Nat'l Ass'n v. CAPCO Am. Securitization Corp., 2005 WL 3046292,
at *16-*17 (S.D.N.Y. Nov. 14, 2005) (holding that defendant was required to comply with its
contractual obligations to repurchase the mortgage because plaintiff had adequately
demonstrated a material breach of warranty); see Ziff-Davis Publ'g Co., 75 N.Y.2d at 503-04
("The right to indemnification depends only on establishing that the warranty was breached.").

Under the terms of the MLPA and the PSA, a Material Breach occurs when (1) a breach
materially and adversely affects the value of the Mortgage Loan and (2) the Mortgage Loan
becomes a Specially Serviced Mortgage Loan. (Ex. 2, § 5(b); Ex. 3, § 2.3). The record plainly
shows that both of these Material Breach triggers have occurred in this case.

### 1.   MSMCI's Breaches Materially and Adversely Affected the Value of the Mortgage Loan

It cannot be disputed that MSMCI's breaches of the Environmental Warranty and the No
Material Default Warranty materially and adversely affected the value of the Mortgage Loan.
The methane problems at the Wal-Mart store -- about which MSMCI admittedly knew but were
not disclosed in the Environmental Report -- made the Mortgage Loan a very high risk loan at
the time it was securitized in May 2007. Indeed, JER (one of the B-piece investors to reject the
Mortgage Loan in a prior pool of loans) told MSMCI just that. (Ex. 28 (the "methane gas levels
that forced Walmart to close . . . makes this a very high risk loan")). LNR (the other B-piece
investor to reject the Mortgage Loan) actually predicted that the Wal-Mart methane problems
will persist and force Wal-Mart to "abandon the store" which, in turn, will cause the Mortgaged
Property to "decline." (Ex. 30).

This, in fact, is exactly what happened. In September 2008, Wal-Mart shuttered its store
permanently citing safety concerns arising from the methane problems at the Wal-Mart store and

at other locations throughout the Mortgaged Property. (Exs. 16 & 21). The loss of the anchor

tenant, without question, materially and adversely affected the value of the Mortgage Loan.

Indeed, MSMCI's own valuation expert, Roger D. Ritley, opined: "Another primary cause of the

decline in the value of the City View Property is that Wal-Mart decided to close its store at the

[Mortgaged] Property. As one of the anchor tenants, it's [sic] decision to stop paying rent had a

significant negative impact on the value of the [Mortgaged] Property, especially at a time when

finding another tenant at a comparable rent was nearly impossible." (Ex. 35 at 34).

Moreover, the loss in value was not limited to the loss of Wal-Mart's rent payments. As

Mr. Ritley further opined: "Once Wal-mart closed other tenants began exercising co-tenancy

clauses in their leases and either began paying percentage rent versus fixed rent and/or closed

their stores and vacated the premises." (Ex. 35 at 10). According to Mr. Ritley, the value of the

Mortgaged Property and the value of the Mortgage Loan "move in tandem, i.e. as the value of a

property declines so does the value of the associated mortgage loan." (Id. at 4). Moreover,

James Butler (MSMCI's purported servicing expert) characterized the Wal-Mart lease

termination as having a "dramatic impact" and being a "catastrophic event." (Ex. 36, Butler

Dep. at 192).

Accordingly, there can be no dispute that the methane problems at the Mortgaged

Property and the subsequent departure of Wal-Mart because of those methane problems

materially and adversely affected the value of the Mortgage Loan. See LaSalle Bank Nat'l

Ass'n v. CAPCO Am. Securitization Corp., 2005 WL 3046292 (S.D.N.Y. Nov. 14, 2005)

(finding that a breach of warranty in a PSA was material as a matter of law because plaintiff

provided evidence demonstrating that as a result of the breach, it was unable to recover the full

value of what was bargained for); see also LaSalle Bank Nat'l Ass'n v. Lehman Bos. Holdings,

237 F. Supp. 2d 618 (D. Md. 2002) (applying New York law) (holding that breach of warranty

addressing defaults in underlying mortgage loan was material and adverse as matter of law where breach concerned existence of adverse environmental conditions at the property that was the subject of the underlying loan).

> **2.** **The Borrower Defaulted and the Mortgage Loan Became a Specially Serviced Mortgage Loan After Wal-Mart Closed its Store for Business**

Shortly after Wal-Mart closed its store for business in September 2008, Borrower defaulted on it payment obligations under the Mortgage Loan.  (Ex. 33).  Citing an imminent payment default, the Master Servicer determined that a "Special Servicing Transfer Event" (as defined in the PSA) had occurred and therefore the Mortgage Loan was transferred to the Special Servicer on or about November 12, 2008.  (Id.)  As a consequence of this transfer, the Mortgage Loan became a "Specially Serviced Mortgage Loan" under the terms of the PSA and MLPA. (Id.)  In accordance with the MLPA, MSMCI was provided written notices of its Material Breaches (see Ex. 34).  Having failed to cure those breaches, MSMCI is now required to repurchase the Mortgage Loan.

## CONCLUSION

For these reasons, Plaintiff respectfully requests that the Court enter summary judgment in its favor.

Dated:  New York, New York
            September 21, 2012

> Respectfully submitted,
>
> Duval & Stachenfeld LLP
>
> By:     //S// Timothy J. Pastore
>             Timothy J. Pastore, Esq.
>             J. Andrew Stephenson, Esq.
>             Ella Wolf, Esq.
>             101 Park Avenue, 11th Floor
>             New York, NY 10178
>             Tel. No.:  (212) 883-1700
>             Attorneys for Plaintiff