USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 6/16/14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE BANK OF NEW YORK MELLON TRUST COMPANY, NATIONAL ASSOCIATION, TRUSTEE FOR THE REGISTERED CERTIFICATE HOLDERS OF MORGAN STANLEY CAPITAL I INC., COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES SERIES 2007-IQ14, ACTING BY AND THROUGH C-III ASSET MANAGEMENT LLC, AS SPECIAL SERVICER,

Plaintiff,

-against-

No. 11 Civ. 505 (CM) (GWG)

MORGAN STANLEY MORTGAGE CAPITAL, INC.,

Defendant.

**MEMORANDUM DECISION AND ORDER GRANTING DEFENDANT'S SUPPLEMENTAL MOTION FOR SUMMARY JUDGMENT**

McMahon, J.:

Plaintiff The Bank of New York Mellon Trust Company, N.A. (the "Trustee"), as trustee for investors in a multi-billion-dollar mortgage-backed securities offering, brought this action against Defendant Morgan Stanley Mortgage Capital, Inc., the originator of one of the mortgage loans backing the securities offering, for breach of several representations and warranties made to investors regarding the nature and quality of that loan. Currently before the Court is Morgan Stanley's supplemental motion for summary judgment, which it made after this Court's June 2013 order granting a motion to reopen discovery.

For the following reasons, the motion is granted.

## BACKGROUND

Familiarity with this Court's previous summary judgment opinion in this case, *Bank of New York Mellon Trust Co. v. Morgan Stanley Mortgage Capital, Inc.* ("*BoNY I*"), No. 11-cv-0505 (CM) (GWG), 2013 WL 3146824 (S.D.N.Y. June 19, 2013), is presumed.

### I. Procedural History

In *BoNY I,* this Court interpreted the parties' Mortgage Loan Purchase Agreement (the "MLPA") and held that sending a notice of cure within three business days of "becoming aware of" a Material Breach was a condition precedent to Morgan Stanley's obligation to repurchase the loan. *BoNY I,* 2013 WL 3146824, at *16-18.[1] I then went on to consider whether the Trustee had given Morgan Stanley timely notice under the MLPA as to each of the two alleged breaches in this case: (1) breach of the Environmental Representation and (2) breach of the No Material Default Representation.

First, I held that the Trustee's notice to Morgan Stanley of its claim for breach of the No Material Default Representation was untimely:

> The Special Servicer had in its possession all of the facts necessary to investigate and bring a claim for breach of the No Material Default Representation at the latest by March 16, 2009, when it "concluded" its first investigation into possible

[1] I reject the Trustee's present challenge to this conclusion, which amounts to an untimely motion for reconsideration. See S.D.N.Y. R. 6.3 ("Unless otherwise provided by the Court or by statute or rule . . . a notice of motion for reconsideration or reargument of a court order determining a motion shall be served within fourteen (14) days after the entry of the Court's determination of the original motion . . . ."). "A party's failure to make a motion for reconsideration in a timely manner is by itself a sufficient basis for denial of the motion." *Grand River Enterprises Six Nations, Ltd. v. King*, No. 02-cv-5068 (JFK), 2009 WL 1739893, at *1 (S.D.N.Y. June 16, 2009). Although courts "sometimes construe untimely motions for reconsideration as being brought under Rule 60(b)," *id.* at *1 n.1, as the Trustee appears to be requesting here, that rule by its terms applies only to a "final judgment, order, or proceeding." Fed. R. Civ. P. 60(b). Neither the previous summary judgment order nor this one is a final order. See *United States v. 228 Acres of Land & Dwelling*, 916 F.2d 808, 811 (2d Cir. 1990). I thus decline to consider the Trustee's new arguments. If the Trustee disagrees with this Court's conclusion, it has a right to appeal.

> breaches of the representations. It "should [have] know[n]" at the time—or at least within the next few months, or even six months, or a year—if there in fact had been a breach of the No Material Default Representation.
>
> The Special Servicer seemingly did nothing to mine the data in its possession for the next eighteen months, until litigation counsel decided to search for new claims. But this does not suffice. . . . Eighteen months after discovery of all relevant facts is neither prompt nor diligent.

*BoNY I*, 2013 WL 3146824, at *23 (quoting *Morgan Guar. Trust Co. of N.Y. v. Bay View Franchise Mortgage Acceptance Co.*, No. 00-cv-8613 (SAS), 2002 WL 818082, at *5 (S.D.N.Y. Apr. 30, 2002)).

The question of whether the Trustee's notice to Morgan Stanley of its claim for breach of the Environmental Representation was more difficult. Although Jennifer Wilkicki, the Special Servicer's asset manager, stated in a February 16, 2009 memorandum (the "Wilkicki Memo"), that she "believe[d]" that the Special Servicer had discovered a Material Breach of the Environmental Representation, Wilkicki submitted an affidavit to this Court in which she averred that this statement was not a final determination on her part, and that she did not conclude her investigation and make her final recommendation to management until March 16, 2009, two days before the breach notice was sent on March 18, 2009. In effect, the Trustee argued that the Special Servicer "did not become secure in Wilkicki's preliminary assessment that she had discovered a Material Breach until it consulted with counsel." *Id.* at *22.

But because the Trustee had refused to provide Morgan Stanley with any discovery on the issue, citing attorney-client privilege, it was impossible to ascertain whether "anything by way of 'investigation' occurred between February 16 and March 16, 2009." *Id.* I therefore granted Morgan Stanley's motion to reopen discovery and ordered the Trustee to produce "any and all communications with any counsel from and after the time that the loan became a Specially Serviced Mortgage Loan to and including March 18, 2009, touching on the subject of

whether Morgan Stanley had breached the Environmental Representation." *Id.* I warned the Trustee that if it refused to waive the privilege and provide discovery, I would "deem the issue resolved in Morgan Stanley's favor as a matter of fact." *Id.* I also warned the Trustee that "if nothing of import happened in the time after February 16 in terms of the investigation—that is, if the Special Servicer can be said to have 'known' that a Material Breach existed as of February 16, 2009—then the Special Servicer (and, hence, the Trustee) will not be excused for failing to make a decision about whether to bring a claim for cure or repurchase within three days of that date." *Id.* at *21.

## II. New Facts from Supplemental Discovery

The following facts from the parties' supplemental discovery are undisputed.

### A. Wilkicki's Initial Investigation

After the Mortgage Loan was transferred to special servicing on November 12, 2008, the Special Servicer began an investigation into potential breaches by Morgan Stanley of the representations and warranties in the MLPA. Wilkicki led the initial investigation beginning in November 2008.

In her Initial Asset Strategy Report, dated December 8, 2008 (the "ASR"), Wilkicki noted that City View's records showed that rents collected for December 2008 amounted to just over $180,000—just 36% of the rent roll of over $500,000. (Perlstein Decl. Ex. 29 at P031402; *see* Unell Dep. at 124:14-126:17). In her First Amended ASR, prepared in January 2009, Wilkicki noted that three other anchor tenants besides Wal-Mart had vacated, and that overall occupancy at City View had dropped from 95% in July 2008 to 47% in December 2008. (Perlstein Decl. Ex. 36 at P003197, P003201; *see* Unell Dep. at 184:7-187:6). The First Amended ASR further explained that when Wal-Mart vacated in September 2008, the Debt Service Coverage Ratio ("DSCR") had fallen below 1.0, meaning that not enough money was coming in from the rents to

cover City View's monthly loan payments. (Perlstein Decl. Ex. 36, at P003199; Unell Dep. at 188:9-190:7).

Sometime around January 13, 2009, the Special Servicer received the Master Servicer's File from Wells Fargo, which included, among other documents, Morgan Stanley's Closing Counsel Transaction Summary, a document that Wilkicki reviewed at some point between January 28, 2009 and February 10, 2009. (Perlstein Decl. Ex. 16 at P002501-2; Perlstein Decl. Ex. 6 at P008375; Perlstein Decl. Ex. 14, ("Supp. Wilkicki Dep.") at 126:24-129:1). In her contemporaneous notes of her review of these documents, Wilkicki noted that she had identified a "rep and warranty exception" in the Closing Counsel Transaction Summary, stating that certain facts were not addressed in the IVI Report, including "numerous 'notices of violation' issued by the Ohio Environmental Protection Agency." (Perlstein Decl. Ex. 6 at P008388; Supp. Wilkicki Dep. at 127:19-128:19; *see* Perlstein Decl. Ex. 1 at P007228). Jenna Unell, the Special Servicer's Associate General Counsel, later testified that Wilkicki had found "sort of a smoking gun." (Perlstein Decl. Ex. 3 ("Unell Dep.") at 19:8-13).

On or about January 30, 2009, the Special Servicer learned that Wal-Mart had terminated its lease at City View Center. (Perlstein Decl. Ex. 30; Unell Dep. at 100:21-101:21). The Special Servicer had known that Wal-Mart had permanently closed its store since September 15, 2008, when Wells Fargo told it so. (Perlstein Decl. Ex. 28).

### B. In-House Counsel's Sign-Off and the Subsequent Delay

On February 16, Wilkicki drafted the Wilkicki Memo and emailed it to Unell, who reviewed it and its supporting documents, and had a conversation with Wilkicki. (*Id.* at 232:4-236:14). Three days later, on February 19, 2009, Unell wrote the following email to Wilkicki:

> Jennifer:
> I have reviewed the documents relating to the potential breach claim against Morgan Stanley in respect of the referenced loan. I agree that there is evidence

> that MS knew that there were material environmental conditions or circumstances affecting the Property that were not disclosed in the Phase I report. Please call me to discuss further. *I think that the breach notice should be sent.*

(Perlstein Decl. Ex. 4 (emphasis added)).

It bears repeating that Unell did not learn about the potential claim against Morgan Stanley for the first time when she saw the Wilkicki Memo on February 16. She already knew before February 16 that Wilkicki and Chris Crouch (Wilkicki's supervisor) believed there "ha[d] to be some kind of claim" against Morgan Stanley given the environmental issues at the Property. (Unell Dep. at 60:15-17, 199:6-200:1). Unell also was aware "early on" that, for the Special Servicer to have a claim, it needed evidence that Morgan Stanley had knowledge of an environmental condition that was not disclosed in the IVI Report. (*Id.* at 200:2-201:4). In her February 19 email, Unell told Wilkicki that there was such evidence, and that "the breach notice should be sent." (Perlstein Decl. Ex. 4).

The MLPA gave the Special Servicer three days to send out notice of any breach. However, Wilkicki did not complete a draft of a breach notice until twelve days later, on March 3. (Perlstein Decl. Ex. 5). This draft notice stated that: (1) there was evidence of a material breach, and (2) the breach had a material and adverse effect on the Property and Loan. (*Id.* at P037389-91). In a paragraph titled "Adverse Effects of Breach," the notice cited Wal-Mart's departure from City View and the fact that, as result, other tenants had also departed or were paying reduced rent. The notice went on:

> The combined effect of the tenants' action has been a decimation of the operating revenue such that the Mortgaged Property cannot meet its basic expenses. In summary, the violations affecting the Mortgaged Property prior to the Closing Date and perpetuated by the Mortgagor and others have had severe adverse affects [*sic*] upon the Mortgaged Property, the Mortgage Loan and the Certificate holders.

(*Id.*). All of the cited facts were known to the Special Servicer prior to January 30, 2014.

It took Unell ten days to review the draft notice. In fact, on March 10, Wilkicki reminded her attorney about the pending notice by asking in an email, "Jenna, have you had a chance to look at this?" (Perlstein Decl. Ex. 67 at P037826). Finally, on March 13, Unell returned the breach notice to Wilkicki, having removed the "Adverse Effects of Breach" paragraph—the one that listed all facts known to the Special Servicer over a month and a half earlier. (Perlstein Decl. Ex. 7 at P037921-24). Neither her edits nor her cover email indicated that there were any outstanding issues to be resolved in order to confirm that a material breach existed. (Perlstein Decl. Ex. 7). Wilkicki replied the same day that she agreed with Unell's edits, and sent the notice to senior management. (Perlstein Decl. Ex. 8).

**C. Senior Management's Rubber-Stamp Approval**

On March 14, 2009, Wilkicki sent the breach notice to her supervisor, Chris Crouch, who responded on March 16: "I am good to go on this…please send to Paul [Smyth] for go ahead to release…thanks." (Perlstein Decl. Ex. 9; Perlstein Decl. Ex. 39). On March 16, Wilkicki sent the notice to Paul Smyth (the Special Servicer's President) with the following note: "I'm now ready to send the attached breach letter, but wanted you to see it first and let me know you are ok with my sending it out. Jenna has edited and Chris has seen as well." (Perlstein Decl. Ex. 11; Perlstein Decl. Ex. 13 ("Smyth Dep.") at 30:2-14).

At their depositions, however, neither Crouch nor Smyth remembered having performed any analysis or having reviewed any particular document relating to the breach investigation. (Perlstein Decl. Ex. 12 ("Crouch Dep.") at 110:9-111:9, 116:21-118:8, 124:22-127:21; Smyth Dep. at 116:6-116:20; 118:17-123:9, 124:24-126:2, 127:11-128:14, 130:18-132:7). Although Crouch testified that he had had "constant communications" with Wilkicki and had communicated with her "from the time we began to initiate if there's a potential breach through the point in time when we decided and received approval to proceed with the notice," he could

not specifically remember any of those communications, and he did not even remember whether he reviewed the breach notice. (Crouch Dep. at 109:20-23, 110:9-24, 122:8-124:5). Smyth remembered only that he reviewed the final breach notice before it was sent. (Smyth Dep. at 117:14-118:1). There is no evidence that Crouch or Smyth contributed anything to the breach investigation, whether by conducting original analysis or by confirming that Wilkicki's analysis was correct.

**D. In-House Counsel's "Struggling and Grappling"**

Unell testified (both in her individual capacity and as a Rule 30(b)(6) witness) that between February 19 (when she stated "I think that the breach notice should be sent") and March 18 (when the notice was actually sent), she reviewed many documents and was "struggling and grappling" with many issues. (Perlstein Decl. Ex. 4; Perlstein Decl. Ex. 6; *see, e.g.*, Unell Dep. at 30:14-31:4, 238:13-239:3, 276:12-277:25, 294:18-24).

Despite all this "struggling and grappling," the only specific analysis that Unell could recall performing was reviewing the documents that the Special Servicer already possessed, and that Wilkicki had already reviewed, before February 16. The only documents that Unell remembered reviewing were the Closing Counsel Transaction Summary, the IVI Report (which also included the Rough Order of Magnitude ("ROM")), the Environmental Insurance Policy, the Ohio EPA Complaint, the MLPA and the PSA, as well as the loan documents. (Unell Dep. at 232:4-233:18, 238:13-239:3; *see* Perlstein Decl. Ex. 1). Moreover, Unell admitted that, by the time she sent her February 19 email, she had already reviewed the "smoking gun"—the Closing Counsel Transaction Summary—which stated that the IVI Report had failed to disclose Notices of Violation ("NOVs"). (Perlstein Decl. Ex. 1; Unell Dep. at 19:8-9, 102:7-15, 234:11-23).

When Unell was asked what happened between February 19 and March 3 (when Wilkicki sent her the draft notice), Unell responded: "I don't really have a specific recollection of what

happened during that particular period." (Unell Dep. at 272:7-13). When asked what she did between March 3 and March 10 (when Wilkicki nudged her about reviewing the notice), Unell responded: "Again, I can't really distinguish between the timeframe. During that entire period we were still making – reviewing all of the documents to determine that we had an appropriate basis to make a claim such as this. And we were reviewing a multitude of documents." (*Id.* at 275:18-276:4). Unell testified that between March 16 and March 18, she spoke with Smyth about whether the notice should be sent, but she could not recall the number or duration of the conversations, whether she reviewed any documents with him, or specifically what was discussed. (*Id.* at 226:7-229:7).

**E. Outside Counsel's Lack of Involvement in the Breach Investigation**

In December 2008, the Special Servicer retained Richard O'Halloran as outside counsel for the purposes of pursuing remedies against City View and/or the Guarantor (Thomas Klein), which primarily involved having a receiver appointed by the court. (Perlstein Decl. Ex. 18 ("O'Halloran Dep.") at 65:3-66:11, 69:9-71:16; 79:10-23; Perlstein Decl. Ex. 20 at RAO000005). Although O'Halloran acknowledged in his deposition that he was not involved in the breach investigation, he did state that he had one conversation with Wilkicki sometime between February 16 and March 18 in which claims against Morgan Stanley were mentioned. (O'Halloran Dep. at 117:9-118:18, 168:18-169:2). Other than this, O'Halloran had no knowledge of the breach investigation. (O'Halloran Dep. at 128:25-131:15; 196:19-198:10).

Before the City View loan was transferred to special servicing in November 2008, Harold Hagen, then an attorney at Dechert LLP, had been engaged by Wells Fargo to conduct a cursory analysis of whether Morgan Stanley had breached the Environmental Representation. (Perlstein Decl. Ex. 19 ("Hagen Dep.") at 40:22-42:9; *see* Perlstein Decl. Ex. 69). Hagen's involvement in the Special Servicer's investigation between February 16 and March 18, 2009 consisted of one

brief conversation with Wilkicki on March 13. In that call with Wilkicki—which, Hagen testified, lasted only three or four minutes (and which is reflected in his time entries as lasting 0.1 hours)—Hagen told Wilkicki that his previous work had revealed no obvious breach of representation, and that he had produced no work product. (Hagen Dep. at 55:6-56:19, 66:1-67:13; Perlstein Decl. Ex. 24 at P038223).

**F. Appraisal Issues**

Although Wilkicki wrote in her February 16 memorandum that there had been a "material and adverse effect" on the value of the Mortgage Loan (and substantiated that conclusion with documents), Wilkicki testified in her supplemental deposition that the Special Servicer was unable to conclude that the breach had any such effect until it had learned, via a commissioned appraisal, the precise value of the City View Property. (Perlstein Decl. Ex. 1 at P07288; Supp. Wilkicki Dep. at 181:25-183:6, 200:7-201:22, 203:10-18). Of course, Wilkicki received a draft appraisal on February 27, 2009 that reported a value of $22.3 million as compared to the appraised value of $103.4 million two years earlier; that was consistent with the loss of tenant after tenant and the precipitous drop in rent collections. Nonetheless, Wilkicki stated that she could not rely on the appraisal until she had "substantiated" it with the help of a Review Appraiser. She claimed that this occurred no later than March 13. (Perlstein Decl. Ex. 26 at P037936; Perlstein Decl. Ex. 2 at MSMC0022882; Supp. Wilkicki Dep. at 83:17-84:21, 117:25-118:12, 167:3-168:1, 177:10-23, 202:21-24, 203:10-18).

Wilkicki never mentioned the appraisal or the Review Appraiser in the papers she previously filed in opposition to Morgan Stanley's original motion for summary judgment. To the contrary, she previously testified that she learned no new facts after February 16, 2009. (*See* Perlstein Decl. Ex. 37 at 128:18-129:7)). During supplemental discovery, however, Wilkicki claimed that these new pieces of information were "instrumental" and "critical" components of

her investigation. (Supp. Wilkicki Dep. at 76:8-13, 93:5-8, 159:2-9.) Similarly, Unell also testified that the Special Servicer needed an "expert opinion" (an appraisal) to determine the current value of the Property before it could make any decisions with respect to Morgan Stanley. (Unell Dep. at 26:10-26:23.)

This is, of course, errant nonsense. In her February 16 memorandum, Wilkicki specifically wrote that "additional facts are detailed herein to demonstrate *the material and adverse effect* the breach has on the interests of the holders of the Certificates in the Mortgage Loan," and then detailed both the environmental issues and the departure of Wal-Mart and other tenants. (Perlstein Decl. Ex. 1 at P007228 (emphasis added)). Wilkicki's claim in her supplemental deposition that, despite what she wrote at the time, she still needed to "quantify" the negative effect of such catastrophes on the loan is nothing more than a desperate effort to rewrite the historical record. (*See* Supp. Wilkicki Dep. at 85:6-87:4). The dates do not work in the Trustee's favor.

In any event, on February 16, the appraiser, Andrew Lorms of Cushman & Wakefield, left a message on Wilkicki's voicemail, stating that the appraisal was nearly done and that he had "definitive values" for her if she needed them. (Perlstein Decl. Ex. 22 at P038198; *see* Perlstein Decl. Ex. 64). There is no evidence that Wilkicki ever called Lorms back before she received the draft appraisal on February 27. (Supp. Wilkicki Dep. at 89:4-90:16).

## DISCUSSION

### I. Summary Judgment Standard

A party is entitled to summary judgment when there is no "genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In addressing a motion for summary judgment, the court "must view the evidence in the light most favorable to

the party against whom summary judgment is sought and must draw all reasonable inferences in his favor. *L.B. Foster Co. v. Am. Piles, Inc.*, 138 F.3d 81, 87 (2d Cir. 1998) (citing *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Whether any disputed issue of fact exists is for the court to determine. *See Balderman v. United States Veterans Admin.*, 870 F.2d 57, 60 (2d Cir. 1989). The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *See Celotex v. Catrett*, 477 U.S. 317, 323 (1986). Once such a showing has been made, the non-moving party must present "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998).

Not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Anderson*, 477 U.S. at 248. Finally, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the non-moving party. *See Anderson*, 477 U.S. at 248.

## II. Morgan Stanley's Supplemental Motion for Summary Judgment on the Ground of Untimely Notice is Granted.

That the Special Servicer became aware of a material breach of the Environmental Representation more than three business days before March 18, 2009, the breach notice was sent to Morgan Stanley, is so amply proven as to be irrefutable.

The record shows that, even before she prepared the Wilkicki Memo on February 16, Wilkicki knew that (1) the Closing Counsel Summary contained a "rep and warranty exception"

showing that Morgan Stanley had likely breached the Environmental Representation; and (2) Wal-Mart had vacated the City View Property and terminated its lease, which showed that the breach was likely "material" under the MLPA. Armed with this information, Wilkicki wrote her February 16 memorandum, which stated, in part:

- "The Special Servicer believes it has discovered a Material Breach of the Seller's Representations and Warranties and hereby provides notice as required by the governing Pooling and Servicing Agreement."
- "The Special Servicer has discovered that the Seller was aware of material and adverse environmental conditions and circumstances affecting the Mortgaged Property that were not disclosed in the Environmental Report."
- "Although the [Closing Counsel Transaction Summary] quite clearly identifies the violation of [the Environmental Representation], additional facts are detailed herein to demonstrate the material and adverse effect the breach has on the interests of the holders of the Certificates in the Mortgage Loan."
- "As a result of the unresolved notices of violation, the Ohio EPA filed a lawsuit in July 2008 . . . ."
- "The anchor tenant, WalMart, vacated its space and discontinued rent payments, citing 'safety concerns and conditions for its customers and employees which rendered the Premises untenantable.'"
- "As a result of WalMart's action, several other tenants have exercised co-tenancy clauses in their leases, which provide for reduced rents, terminated leases or have discontinued rent payments."

(Perlstein Decl. Ex. 1 at P007228-30).

And if it was not already aware when Wilkicki finished drafting her memo on February 16, the Special Servicer certainly became aware of Morgan Stanley's material breach three days later, on February 19, when Unell, the Special Servicer's Associate General Counsel, wrote to Wilkicki, "I agree that there is evidence that MS knew that there were material environmental conditions or circumstances affecting the Property that were not disclosed in the Phase I report. Please call me to discuss further. *I think that the breach notice should be sent*." (Perlstein Decl.

Ex. 4 (emphasis added)). Unell's vague, rambling deposition testimony—in which she essentially stated only that she spent a month "struggling" and "grappling" with her review of documents that the Special Servicer had received in January, and that Wilkicki had already reviewed before February 16—does not create a genuine issue of fact on this point. Unell's February 19 email, in which she (1) agreed with Wilkicki that Morgan Stanley knew of environmental conditions that had not been disclosed in the IVI Report, and (2) *specifically stated that she thought the breach notice should be sent*, does not alter the devastating facts, of which Wilkicki was indisputably aware.

Perhaps recognizing its predicament, the Trustee now argues for the first time that the Special Servicer needed to obtain a formal appraisal of the City View property before it could determine conclusively that Morgan Stanley had committed a "Material Breach" under the MLPA. But by February 16, Wilkicki already knew that (1) Wal-Mart, the property's most important tenant, had permanently closed its store and terminated its lease; (2) three other anchor tenants besides Wal-Mart had also vacated; (3) overall occupancy at the property had dropped from 95% in July 2008 to 47% in December 2008; and (4) the property's DSCR had fallen below 1.0, which meant that not enough money was coming in from rents to cover City View's monthly loan payments. This was not a situation in which the Special Servicer needed an appraisal to know that the value of the City View Property had been materially and adversely affected.

And even if were such a situation, an appraisal was there for the taking. On February 16, Andrew Lorms of Cushman & Wakefield left a phone message for Wilkicki in which he said that his appraisal of the City View Property was nearly done and that he had "definitive values" for her if she needed them. Wilkicki never called him back. This obvious attempt to stall failed on February 27, when Lorms sent in his draft appraisal anyway—an appraisal that reported a market

value of $22.3 million (a 78.4% drop from its previously appraised value of $103.4 million in January 2007).

In short, the Special Servicer probably became aware of Morgan Stanley's alleged breach prior to February 16, when Wilkicki prepared her memorandum, but certainly became aware of it by February 19, when Unell agreed with Wilkicki's assessment and instructed her to send the breach notice. Even giving the Trustee every possible benefit of the doubt, the absolute, drop-dead date on which the Special Servicer became aware of the material breach was February 27, when the draft appraisal came in. Three business days after February 27 was March 3—two full weeks before the Special Servicer eventually sent the breach notice. The breach notice was therefore untimely under the MLPA.

## CONCLUSION

For the foregoing reasons, Morgan Stanley's supplemental motion for summary judgment is granted. The Clerk of the Court is directed to remove Docket No. 81 from the Court's list of pending motions and to close the file.

Dated: June 16, 2014

U.S.D.J.

BY ECF TO ALL COUNSEL