UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------- x
THE BANK OF NEW YORK MELLON TRUST   :
COMPANY, NATIONAL ASSOCIATION, TRUSTEE   :
FOR THE REGISTERED CERTIFICATE HOLDERS OF   :
MORGAN STANLEY CAPITAL I INC.,   :
COMMERCIAL MORTGAGE PASS-THROUGH   :
CERTIFICATES SERIES 2007-IQ14, ACTING BY AND   :
THROUGH C-III ASSET MANAGEMENT LLC, AS   :
SPECIAL SERVICER,   :   11 Civ. 0505 (CM)(GWG)
  :
              Plaintiff,   :
  :
      -against-   :
  :
MORGAN STANLEY MORTGAGE CAPITAL, INC.,   :
  :
           Defendant.   :
--------------------------------------------------------------------- x

## JOINT PRETRIAL ORDER

      The parties having conferred among themselves and with the Court pursuant to Fed. R.

Civ. P. 16, the following statements, directions and agreements are adopted as the Pretrial Order

herein.

I.      NATURE OF THE CASE

      This is a breach of contract action brought by plaintiff, The Bank of New York Mellon

Trust Company, National Association, (the "Trustee" or "Plaintiff"), as trustee for the registered

certificate holders (the "Investors") of Morgan Stanley Capital I Inc., Commercial Mortgage

Pass-Through Certificates Series 2007-IQ14 (the "Trust"), acting by and through C-III Asset

Management LLC, as Special Servicer ("C-III" or the "Special Servicer"), against defendant,

Morgan Stanley Mortgage Capital Inc. ("Defendant" or "Morgan Stanley"), as mortgage loan

seller.

The Investors seek damages for Morgan Stanley's refusal to repurchase an $81,000,000 mortgage loan (the "City View Loan" or the "Mortgage Loan") that it sold to the Trust on the grounds that Morgan Stanley breached a written representation concerning environmental conditions at the mortgaged property that it made in connection with selling the Mortgage Loan to the Trust.

Morgan Stanley denies the allegation of material breach and contends that Plaintiff failed to give prompt notice of its claim and a request to cure, as required by the MLPA and PSA.

## II.     JURY

This case will be tried to a jury.  The parties estimate the length of trial to be 15-20 trial days.

## III.     STIPULATED FACTS

The parties have agreed that the following statements of fact are true and correct and the Court and jury may consider such facts as conclusively established, without further proof, for the purposes of this action only:

1.     The Court has personal jurisdiction over the parties and venue is proper under 28 U.S.C. § 1391(a) because Defendant has its principal place of business in this District, a substantial part of the events or omissions allegedly giving rise to the claims occurred in this District, and Defendant was subject to personal jurisdiction in this District as of the date this action was commenced.

2.     Wal-Mart Real Estate Business Trust ("Wal-Mart") entered into a lease agreement with Garfield Land Development, LLC ("Garfield") dated March 7, 2005 (the "Lease Agreement").

3.     On December 29, 2006, Defendant made a mortgage loan (the "Mortgage Loan") in the principal amount of $81,000,000 to City View Center, LLC ("City View" or "Borrower")

2

in connection with Borrower's purchase of a retail shopping center (the "Mortgaged Property" or "City View Center") from Garfield pursuant to a written loan agreement (the "Loan Agreement").

4.      The Loan Agreement is a valid and binding contract.

5.      Thomas Klein was the sole member of City View Holding Company, LLC, which was the sole member of City View.

6.      The Mortgaged Property is located in Garfield Heights, Ohio, and was constructed on top of portions of two former municipal solid waste landfills.

7.      The Mortgaged Property was operating under the supervision of the Ohio EPA under Rule 13 Authorization ("Rule 13"), which pertains to landfill usage.

8.      Beginning in 2005, the Ohio EPA issued Notices of Violation ("NOVs") with respect to the Mortgaged Property.

9.      In connection with the prospective securitization of the Mortgage Loan, Morgan Stanley prepared an Asset Summary Report ("ASR") for potential B-piece investors.

10.     On or about May 1, 2007, Defendant sold the Mortgage Loan, along with other commercial loans, to Morgan Stanley Capital I Inc. (the "Depositor"), pursuant to a Mortgage Loan Purchase Agreement, dated as of May 1, 2007 (the "MLPA").

11.     The MLPA is a valid and binding contract.

12.     Paragraph (12)(i) of Exhibit 2 of the MLPA contains an "Environmental Representation" made by Defendant.

13.     The "Environmental Report" referenced in the Environmental Representation is the Phase I Environmental Site Assessment prepared by IVI Due Diligence Services, Inc. ("IVI"), bearing Bates Nos. MSMC0048409-MSMC0048515 (the "Environmental Report").

14.     Pursuant to a Pooling and Servicing Agreement dated as of May 1, 2007 (the "PSA"), the Depositor transferred a pool of loans, including the Mortgage Loan, into the Morgan Stanley Capital I Trust 2007-IQ14 (the "Trust"), which was established to hold the loans for the benefit of the certificate holders (i.e., investors).

15.     The PSA is a valid and binding contract.

16.     The PSA named The Bank of New York Trust Company, National Association, as the trustee of the Trust.

17.     The Bank of New York Mellon Trust Company, National Association ("BoNY"), is the successor entity to The Bank of New York Trust Company, National Association.

18.     The PSA named Wells Fargo Bank, National Association, as the master servicer for the Morgan Stanley loans deposited in the Trust.

19.     The PSA appointed Centerline Servicing, Inc. ("Centerline") as the special servicer of the loans deposited in the Trust.

20.     As set forth in the PSA, the closing date of the IQ-14 securitization was May 30, 2007.

21.     The MLPA and PSA are governed by New York law.

22.     The Trust issued certificates to the Depositor, which, in turn, sold the certificates to an underwriter for eventual sale to investors.  The certificates are known as the "Series 2007-IQ14" or "IQ14" certificates.

23.     On September 15, 2008, Wal-Mart closed its store at the Mortgaged Property.

24.     On November 8, 2008, City View defaulted on the Mortgage Loan.

25.     On November 12, 2008, Wells Fargo, as master servicer, transferred the servicing of the Mortgage Loan to Centerline, as special servicer.

26.     On January 30, 2009, Wal-Mart terminated its lease.

## IV.     PARTIES' CONTENTIONS

The pleadings are deemed amended to embrace the following, and only the following, contentions of the parties:

### PLAINTIFF'S CONTENTIONS

Plaintiff hereby incorporates by reference all Stipulated Facts into its Contentions.  In making these Contentions, Plaintiff neither limits nor intends to limit the evidence that it will offer at trial.  Because of the extent of the record in this action, Plaintiff intends that the citations to exhibits and anticipated testimony are illustrative but not exhaustive.

### A.     The City View Center

1.      In early 2004, McGill Property Group, LLC, Garfield, and GHLFP, LLC, purchased the Mortgaged Property, which is located on the site of two municipal solid waste landfills that closed in the 1970s.  (PX-4; PX-9; PX-151; *supra* Part III ("Stipulated Facts"), at ¶ 6.)

2.      Pursuant to Rule 3745-27-13 of the Ohio Administrative Code, which governs landfill usage, Ohio EPA supervised construction of the City View Center.  (Stipulated Facts ¶ 7.)

3.      Under the rule, colloquially called Rule 13, the City View Center was required to meet certain landfill closure requirements, such as adequately capping the landfill and installing an underground methane gas extraction system with sensors and alarms.  (PX-9; Def. Morgan Stanley Mortgage Capital Inc.'s Resp. to Pl.'s Statement of Material Facts Pursuant to Local Rule 56.1(b) ("Def.'s Rule 56.1 Counterstatement"), at ¶ 13.)

4.      Moreover, pursuant to Rule 13, the Ohio EPA set 25% of the lower explosive level ("LEL") for methane gas as the maximum permissible level of methane presence in the structures.  (PX-211; PX-213; Testimony of Peter Alvey; Def.'s Rule 56.1 Counterstatement ¶ 13.)

**B.      *Defendant Learned of Methane Gas Intrusion at Wal-Mart After the July 2006 Environmental Report***

5.      On July 5, 2006, LaSalle Bank, N.A. ("LaSalle"), which is not a party in this action and was one of City View's prospective lenders, hired IVI to provide the Environmental Report.  (PX-3; PX-12; Def.'s Rule 56.1 Counterstatement ¶ 53.)

6.      The Environmental Report, dated July 25, 2006, was based in part on an interview with an Ohio EPA official in July 2006 and a site visit on July 14, 2006.  (PX-3; Def.'s Rule 56.1 Counterstatement ¶¶ 26, 53.)

7.      The Environmental Report concluded that there was "no evidence of recognized environmental conditions in connection with the [Mortgaged Property,] and [that] no further investigation is currently recommended."  (PX-4.)

8.      On October 25, 2006, methane was detected at the Wal-Mart store in the City View Center at a level of 100% of the LEL.  (PX-11.)

9.      On October 31, 2006, Wal-Mart was shut down for a day because an "alarm went off and there were elevated readings of methane gas."  (West Dep. 32:12-33:2; Testimony of Romona West, Wal-Mart's Rule 30(b)(6) Witness.)

10.     In November 2006, Defendant was engaged in due diligence in anticipation of making the Mortgage Loan to the Borrower.

11.     By November 2, 2006, Defendant had actual knowledge that material and adverse environmental conditions and circumstances were affecting the Mortgaged Property.  That day,

Kristin Sansone ("Sansone"), then the Vice President of the Fixed Income Group at Morgan Stanley, acknowledged in an email that Defendant "already kn[e]w there [was] a problem" at the City View Center with respect to methane.  (PX-10; PX-342; Testimony of Kristin Sansone.)

12.     Sansone also stated that the fact that the July 25, 2006 Environmental Report recommended against further investigation "doesn't mean that the property is fine . . . ."  (PX-10; PX-342; Testimony of Kristin Sansone.)

13.     In response to Sansone's email, Sharon Fowler ("Fowler"), a senior underwriter for Morgan Stanley, inquired further about the "environmental issue" at the Mortgaged Property. (PX-10; PX-342.)

14.     On November 21, 2006, methane was detected at the Wal-Mart store and at the City View Center's "Retail 'M'" location at levels of 100% of the LEL.  (PX-15.)

15.     Defendant knew that the environmental problems at City View Center posed a significant business risk.  (Testimony of Kristin Sansone; Testimony of Ivan Yee; Testimony of James Chung.)

16.     Early in its inquiry into whether the Mortgaged Property was suitable security for a loan, Defendant learned that Wal-Mart was one of the larger tenants on the site.  (Testimony of Stephen Holmes; Testimony of Cynthia Eckes, Defendant's Rule 30(b)(6) Witness.)  In fact, Wal-Mart served as the "anchor tenant."  (Eckes Dep. 92:18-93:7; Testimony of Cynthia Eckes.)

17.     In December 2006, Defendant learned that methane gas intrusions had forced Wal-Mart to close its store on December 5, 2006, and December 6, 2006—in the middle of the holiday shopping season—"to protect public health."  (PX-21; Testimony of Romona West, Wal-Mart's Rule 30(b)(6) Witness.)

18.     On December 5, 2006, Wal-Mart detected methane levels at 100% of the LEL in at least three places: the women's restroom, the store's Vision Center, and the front of the store. (PX-262.)

19.     Wal-Mart stated:  "Based on these [methane] levels and locations W/M Home office closed the store."  (PX-262.)  The primary reason for the closure was "elevated levels of methane gas," and Wal-Mart was "very concerned . . . for the safety of [its] customers and [its] associates."  (West Dep. 31:17-32:5, 59:10-21; Testimony of Romona West, Wal-Mart's Rule 30(b)(6) Witness.)

20.     On December 6, 2006, methane was still detected at levels above 100% of the LEL.  (PX-262.)

21.     Wal-Mart did not reopen until December 7, 2006.  (PX-21; PX-262.)

22.     On or about December 14, 2006, pursuant to Wal-Mart's lease, counsel for Wal-Mart delivered a written Notice of Default to Garfield, citing "elevated and unsafe levels of methane" and Garfield's failure to deliver a fully effective and operational venting system for the gas. (PX-21.)

23.     On December 14, 2006, Wal-Mart agreed with Garfield to jointly retain two companies (Alemko and McCabe Corporation ("McCabe")) to monitor the City View site for methane.  (PX-359.)

24.     In December 2006, Morgan Stanley proposed including the Mortgage Loan—which had not yet been closed—in a securitization pool known as HQ-11.  (PX-23; PX-53; Testimony of James Chung; Def.'s 56.1 Counterstatement ¶ 45.)  On December 19, 2006, Keith Belcher ("Belcher"), a principal at prospective B-piece investor JER Partners L.L.C. ("JER"),

expressed "concern" about the "environmental condition" of the Mortgaged Property.  (PX-23; Testimony of James Chung.)

25.     On December 26, 2006, Defendant received a summary of the coverage provided by a ten-year, $10 million environmental insurance policy that the Borrower had purchased. (PX-26; PX-286.)  The insurance policy singled out for specific coverage, among other things, "methane gas release" causing "on-site bodily injury and property damage" and "methane gas explosion or fatality."  (PX-26.)

### C.     Defendant Hastily Closed the Mortgage Loan Despite Its Knowledge of Additional Serious Methane Problems

26.     On December 28, 2006, Defendant received a copy of an estoppel letter from Wal-Mart concerning the two-day closure of its store because of methane gas intrusion.  (PX-29.)

27.     In the letter, Wal-Mart stated that methane was detected in the store at levels above 100% of the LEL, and that the elevated methane levels had caused the closure.  (PX-29.)

28.     The estoppel letter triggered a flurry of emails among Defendant's employees, who were preparing to close on the Mortgage Loan the following day.  (PX-28; PX-33; PX-34; PX-284; PX-285; PX-286; PX-288; PX-289; PX-330.)

29.     In an email timestamped 5:12 PM on December 28, 2006, Sansone stated that she had believed Defendant had "boxed the environmental risk" but that a "new situation" had arisen: the closure of the Wal-Mart store "due to elevated levels of methane."  (PX-284; Testimony of Kristin Sansone.)

30.     Sansone, who served as an executive director of the Fixed Income group at the time, stated that Defendant should still proceed with the Mortgage Loan, in part because "the source of the methane leak was repaired."  (PX-284; Testimony of Kristin Sansone.)  Sansone

also stated that the Mortgage Loan deal "has to close tomorrow – purchase, real deadline."  (PX-284.)

31.     At 5:28 PM, Robert Demchak ("Demchak"), an executive at the Fixed Income Group of Morgan Stanley, corrected Sansone, stating that "there is no conclusive determination to date as to the cause of the methane leak."  (PX-284.)  Later that night, and again the following morning, Demchak ordered another employee to find out more about the "methane gas issue." (PX-289.)

32.     At 5:29 PM, Sansone sent a separate email to Stephen Holmes ("Holmes"), an executive director for the Commercial Mortgage-Backed Securities Group, expressing concern about the limited nature of the environmental insurance policy and stating that the term of the policy was too short.  (PX-288; Holmes Dep. 21:3-21.)

33.     At 5:39 PM, James Chung ("Chung"), an executive director of the Principal Transactions group, asked why Defendant could not require an environmental insurance policy for a longer term than ten years.  (PX-33; Chung Dep. 19:9-13; Testimony of James Chung.) Sansone responded a minute later, saying that she thought the "premium goes crazy high" and that the insurance policy already was priced at $400,000.  (PX-34.)

34.     Chung expressed concerns in a reply email timestamped 6:21 PM that day.  He stated that "JER was generally ok with the env situation[,] but with the new methane issue I think they might become nervous."  (PX-285; Testimony of James Chung.)  Belcher of JER had expressed serious concerns to Chung about methane, telling him that JER "had a nightmarish experience with a property built over a landfill in the past. . . .  [E]levated levels of methane forced them to evacuate the residents."  (PX-285.)

35.     At 6:30 PM, Sansone said that although Defendant's credit committee had approved the loan, "I am now concerned to hear that Keith had a nightmarish experience with a property built over a landfill and clearly the Wal-Mart problem will highlight the fact we have environmental problems." (PX-285.)  She stated that "there still is a chance that a B piece buyer just won't want to deal with the situation." (PX-285.)

36.     At 6:42 PM, Chung sent an email:  "Does our env policy cover this methane problem?" (PX-285.)  Ivan Yee ("Yee"), a senior mortgage originator for Defendant, responded at 6:53 PM:  "The insurance would cover a new leak, but not the Walmart one, since it happened prior to being put in place." (PX-285; Yee Dep. 25:20-24.)

37.     At 9:04 PM, Chung wrote that he was "disturbed" that the Seller did not disclose the Wal-Mart closure.  Chung also asked whether the environmental insurance policy would sufficiently protect against potential "widespread methane problems" at the site in the future. (PX-49.)

38.     Despite the numerous concerns raised internally at Morgan Stanley the previous night, and despite the substantial uncertainty surrounding the environmental condition of the Mortgaged Property, Sansone decided on the morning of December 29, 2006, to proceed with closing the Mortgage Loan.  (PX-33.)  In an email timestamped 8:39 AM, Sansone stated that she "was disappointed that we didn't know about [the closure] earlier," but that Defendant should continue with the closing of the Mortgage Loan.  (PX-33; Testimony of Kristin Sansone.)

39.     Replying in an email timestamped 9:14 AM, Chung gave the "go ahead":  "I suspect we will be ok here with jer." (PX-28.)  Within a month, he was proven wrong.  (PX-48.)

40.     In a separate email, Holmes wrote that he approved of proceeding with the Loan "[a]s long as Walmart doesn't have an out and is only seeking damages for two days of lost

sales . . . ."  (PX-34.)  Although Defendant closed the loan despite this concern, Wal-Mart did in fact have an "out" that it ultimately used to terminate the lease (PX-1; PX-193).

41.     On December 29, 2006, and in anticipation of striking a deal with JER, Defendant closed on the Mortgage Loan, with a principal amount of $81,000,000.  The proceeds from the Mortgage Loan helped Garfield acquire City View Center.  (Stipulated Facts ¶ 3.)

42.     Despite the availability of updated and material information concerning the environmental problems at the Mortgaged Property, Defendant did not request IVI to update the July 2006 Environmental Report in advance of the December 2006 Mortgage Loan closing.  (Testimony of Peter Alvey.)

43.     Rather, on November 14, 2006, Defendant engaged IVI only to "[r]eaddress" to Morgan Stanley the July 2006 report that had originally been issued to LaSalle Bank, N.A., in July.  (PX-4; PX-13.)  Defendant was incentivized to readdress the report, as opposed to commissioning a new report, because doing so saved significant time and money.  (Yee Dep. 82:24-87:18; Testimony of Ivan Yee.)  Another incentive was that disclosing harmful information would impede its ability to sell the Mortgage Loan by revealing material and adverse environmental conditions and circumstances.  IVI neither performed a site review nor interviewed Ohio EPA officials for the November 2006 "readdress."  (Sansone Dep. 73:21-74:12; Testimony of Kristin Sansone.)

### D.     *Defendant Struggled to Find Investors for the Mortgaged Property*

44.     Having made the Mortgage Loan, Defendant needed to find an investor to buy it.  Given the environmental problems that Defendant knew existed at the Mortgaged Property, the need became more urgent.

45.     On January 1, 2007, an appraisal of the Mortgaged Property valued it at $103.4 million.  (PX-365.)

46.     On January 3, 2007, Alemko detected methane levels above 100% of the LEL at a floor drain in the Wal-Mart family restroom.  (PX-42.)

47.     On January 5, 2007, counsel for Defendant prepared a document called the Closing Counsel Transaction Summary in preparation for securitization of the Mortgage Loan. The Closing Counsel Transaction Summary stated that the IVI Environmental Report "did not address the numerous 'notices of violation' issued" by the Ohio EPA and CCBH.  (PX-41; Testimony of Cynthia Eckes.)

48.     On January 30, 2007, Belcher of JER informed Defendant that the company was "having problems with City View."  (PX-48; Testimony of Cynthia Eckes.)  He wrote that JER's site inspection "indicated that the property was recently reported to have had methane gas levels that forced Walmart to close briefly."  (PX-48.)  Belcher also stated that JER had learned of the prior landowners' "continuing difficulties with the State regarding the environmental issues." (PX-48.)

49.     Belcher stated:  "We recognize there is borrower equity and environmental insurance however, the potential decline in value related to the possible methane problems is greater than the insurance."  (PX-48.)  He stated that City View had "no operating history" and was an investment of an "unproven nature."  (PX-48.)

50.     According to Belcher, "the potential environmental issues (real or the public stigma) and concerns over the potential settlement of the buildings, makes this a very high risk loan."  (PX-48.)

51.     Belcher concluded by saying that "[i]t is very likely we will want this one removed from the pool."  (PX-48.)

52.     Shortly thereafter, JER refused to invest in the B-Piece of HQ-11 until the Mortgage Loan was removed.  (Testimony of James Chung; Testimony of Cynthia Eckes; Def.'s Rule 56.1 Counterstatement ¶ 45.)  Defendant agreed, and JER then invested in the HQ-11 pool with the Mortgage Loan removed.  (Testimony of James Chung; Testimony of Cynthia Eckes.)

53.     Defendant next sought to include the Mortgage Loan in a proposed securitization pool called IQ-13.  (Testimony of James Chung; Testimony of Cynthia Eckes; Def.'s Rule 56.1 Counterstatement ¶ 46.)

54.     From a March 1, 2007 email, Defendant knew that another investor, LNR Property LLC ("LNR"), was worried about investing in the B-piece of the IQ-13 pool because it included the Mortgage Loan.  (PX-68; Testimony of Cynthia Eckes.)

55.     Defendant recognized that LNR was "worried about the possibility of Wal Mart leaving" because of methane problems.  (PX-68.)

56.     LNR invested in the B-Piece of IQ-13 only after Defendant removed the Mortgage Loan from the pool.  (Testimony of Cynthia Eckes; Def.'s Rule 56.1 Counterstatement ¶ 47.)

57.     The refusals by JER and LNR to invest in pools that included the Mortgage Loan presented a serious problem for Defendant, because if it were unable to sell the Loan to investors, it would was at risk for any loss that might occur on the Loan, and it would tie up firm capital.

58.     On March 7, 2007, Defendant received a copy of a February 23, 2007 letter from Wal-Mart's counsel stating that numerous structural problems and spiking levels of methane gas

intrusion existed.  (PX-65; PX-74; PX-75; Def.'s Rule 56.1 Counterstatement ¶ 18.)  Wal-Mart

also stated that the "cap in the pharmacy drain appears to be cracked and is allowing methane to

enter" the store and that "these structural issues underlying the methane intrusion into our store

need to be remedied immediately."  (PX-65.)

**E.    *Despite Knowledge of Serious Environmental Problems, Defendant Provided Plaintiff with an Outdated and Inaccurate Environmental Report***

59.    On March 16, 2007, after two failed attempts at including the Mortgage Loan in

securitizations, Defendant acknowledged that it needed a new environmental site assessment

report.  (PX-81.)

60.    Yee, then a senior originator for Defendant, wrote in an email:  "We are trying to

get [an update to the Environmental Report] today, but we may also have a new report done by

IVI regarding the Wal-Mart issue as well.  I don't think we should send any of the environmental

reports without it.  Kristin and/or I will let you know when that is expected.  They are aware of

our time-frame."  (PX-81.)

61.    Yee believed that the problems at Wal-Mart needed to be disclosed in a new

environmental site assessment report.  (Testimony of Ivan Yee.)

62.    No new report was ever produced.  Defendant decided only to "update" the old

IVI Environmental Report.

63.    On March 19, 2007, Defendant received IVI's "update" to the Environmental

Report.  (P-4; PX-83; PX-84; Def.'s Rule 56.1 Counterstatement ¶ 26; Testimony of Ivan Yee.)

64.    Although IVI's March 19, 2007 report purported to be an "update," IVI had last

visited the Mortgaged Property on July 14, 2016.  (PX-3; Def.'s Rule 56.1 Counterstatement

¶¶ 26, 53.)

65.     In a letter dated March 27, 2007, counsel for Wal-Mart stated that water was blocking the methane extract system; that the store still detected methane readings at several floor drains; and that in some areas, the level of methane gas was explosive.  (PX-87.)

66.     In a letter dated April 6, 2007, Wal-Mart stated that it had detected methane every day that week, with the highest readings in the electrical room.  (PX-91; PX-299.)

67.     Wal-Mart stated:  "At this point it appears the past attempts at remediation are not working and this causes us concern.  These structural issues underlying the methane intrusion into our store need to be remedied immediately."  (PX-91; PX-299.)

68.     There is no evidence that from December 29, 2006, the day it made the $81 million Mortgage Loan, to May 30, 2007, when the IQ-14 securitization closed, Defendant ever requested that Wal-Mart, the property manager, the Borrower, the Seller, Alemko, Hull & Associates, Inc. ("Hull"), or anyone else keep it apprised of developments with respect to methane problems at the Mortgaged Property, even though Defendant was aware that substantial methane issues existed.

## F.     *Defendant Breached the Environmental Representation*

69.     Pursuant to Section 12(i) of Exhibit 2 to the MLPA, Defendant made an Environmental Representation with respect to the Mortgaged Property.  (Stipulated Facts ¶ 12.) In relevant part, Defendant represented and warranted that "[a]n environmental site assessment, or an update of a previous such report, was performed with respect to" the Mortgaged Property, and that "a report of . . . such assessment (or the most recent assessment . . . ) . . . has been delivered to the Purchaser, and the Seller has no knowledge of any material and adverse environmental condition or circumstance affecting [the] Mortgaged Property that was not disclosed in such report."  (PX-99.)

16

70.     On May 30, 2007, Defendant provided the March 2007 "update" to the Environmental Report to Plaintiff as the "Purchaser" at the closing of the securitization.  (PX-3; Def.'s Rule 56.1 Counterstatement ¶¶ 26, 53; Stipulated Facts ¶ 13.)

71.     In delivering the IVI Environmental Report at the closing, Defendant represented and warranted that, as of May 30, 2007, it "ha[d] no knowledge of any material and adverse environmental condition or circumstance affecting any Mortgaged Property that was not disclosed in [the IVI] report."  (PX-99; Stipulated Facts ¶ 12.)

72.     Defendant knew of numerous material and adverse environmental conditions or circumstances affecting the Mortgaged Property that were not disclosed in the "updated" Environmental Report.  As of May 30, 2007, Defendant was aware of actual and repeated methane intrusion into the Wal-Mart store, repeated detection of elevated methane levels above the waste cap and directly beneath the floor slab, and other environmental issues.  Although the senior originator of the Mortgage Loan had urged obtaining a new report to address the methane problems, and Defendant knew that two B-piece investors had refused to invest in the Mortgage Loan because of the methane issue, the Defendant closed the securitization.  Alternatively, Defendant was willfully blind and consciously avoided these problems.

73.     The "updated" Environmental Report downplayed the risks by strongly implying that the environmental conditions were carefully and successfully controlled.  The report blandly reported the OEPA's supervisory authority and identified the various methane control measures installed at the Mortgaged Property, but omitted such material facts as that those controls had repeatedly failed, and that (as detailed further below) the Ohio EPA had repeatedly concluded that the landfill had not been properly developed and sealed.  (PX-4.)

74.     The Environmental Report compounded the impression of a clean, well-functioning site.  On its first page, the Environmental Report inaccurately concluded that there was "no evidence of recognized environmental conditions," and that "no further investigation is currently recommended."  (PX-4.)  Defendant knew, was willfully blind, or consciously avoided learning about facts that showed that these conclusions were incorrect.

75.     Defendant was aware, prior to May 30, 2007, of the need for a deeper and more current analysis of the environmental conditions at the Mortgaged Property than was provided by IVI's "update" of the July 2006 Environmental Report.  Defendant's own senior originator, Yee, recognized the need for a new report that squarely addressed the methane problems, but Defendant failed to obtain such a report.

76.     Rather than perform that analysis, Defendant consciously disregarded and remained willfully blind to additional facts that would have revealed additional material and adverse environmental conditions or circumstances.  (Testimony of Stephen Holmes.)

77.     For example, numerous NOVs publicly available from the Ohio EPA and CCBH prior to May 30, 2007, stated, among other things, that:

> a.  The developer of the City View Center improperly constructed the solid waste cap; failed to control leachate such that it "infiltrate[d] through unauthorized, unlined collection ponds and through uncapped exposed waste"; and failed to control the migration of methane and other gases.  (PX-247; PX-349; PX-351; PX-352; PX-366.)
>
> b.  Despite installation of a tile drain, leachate was flowing into a storm water catch basin; white sludge was seen flowing into the sewers; methane was detected at 40% of the LEL just outside the site; the membrane liner at the

18

Dick's Sporting Goods retail building was not installed according to approved plans; and two required gas monitors had not been timely installed.  (PX-366.)

c.   Explosive gas floor monitoring ports were not timely installed.  (PX-349; PX-366.)

d.   Light fixtures in the parking lot had only one passive methane vent, when they should have had two, pursuant to Rule 13.  (PX-366.)

e.   A venting pipe was improperly constructed, and explosive gas monitors were missing.  (PX-247; PX-349.)

f.   Methane at levels of about 40% of the LEL was detected just outside the property.  (PX-356; PX-366.)

g.   Soil was installed at the site multiple times without required pre-approval by the Ohio EPA.  (PX-247; PX-352; PX-354.)

h.   Exposed waste was observed three times.  (PX-247; PX-347; PX-366.)

i.   Caps had not been timely placed over exposed waste at the site.  (PX-366.)

j.   The waste cap covering the landfill lacked the proper thickness, gradation, permeability, and materials when tested on May 10, 2006.  (PX-351; PX-366.)

k.   The material used in the cap "consisted of shale, shale fragments, weathered shale, rock, rock fragments[,] and gravel," in violation of Ohio EPA standards. (PX-247.)

l.   The clay cap was made of improper material, with "[m]any large pieces (greater than six inches) of stone, asphalt, concrete[,] and clay pavers."  (PX-351.)

m. During five visits, leachate outbreaks were seen flowing from the western parts of the Mortgaged Property and entering nearby ponds.  (PX-366.)

n. A breach in a leachate storage pond led to leachate leakage in the northern part of the premises.  (PX-247; PX-349.)

o. The owners failed entirely to implement a required Leachate Management Contingency Plan in October and November 2005, and only partially implemented the plan by February 2006.  (PX-366.)

p. Pipes used for leachate collection along the slopes of the Mortgaged Property were disconnected or in need of immediate repair.  (PX-347.)

q. During four visits, inspectors discovered land erosion that "compromised the integrity of the cap system."  (PX-345; PX-347; PX-366.)  Land erosion at the Mortgaged Property was "severe," "[l]arge," and "deep."  (PX-247; PX-349; PX-366.)

78. Moreover, HzW Environmental Consultants LLC ("HzW") conducted a Phase 1 environment site assessment and provided a report to Thomas Klein, the principal of the City View Center, on November 6, 2006 (the "HzW Report").  (PX-9)  The HzW Report stated that:

a. Methane gas and leachate at the Mortgaged Property constituted "recognized environmental condition[s]."  (PX-9.)

b. There were "leachate outbreaks along the western slope" of the Mortgaged Property, and the methane had an "explosive nature" and "noxious qualities." (PX-9.)

c.  An Ohio EPA official, Judy Bowman ("Bowman"), said "methane gas generation is the agency's primary concern [with respect to the Mortgaged Property,] with leachate generation and management a close second."  (PX-9.)

d.  Bowman also said that there were "problems" with the "disturbance of waste during construction," the "placement[s] of the liner underneath the [Mortgage Property] to block methane migration," the "placement of the methane collection system under the building pads and parking areas," the "pre-qualification of cap materials by the Ohio EPA," and a retaining wall that was not constructed in accordance with Rule 13.  (PX-9.)

e.  Bowman also said "there was [s]ome question as to whether or not the final cap thickness" complied with Rule 13.  (PX-9.)

f.  Another Ohio EPA official, Karen Naples ("Naples"), said that "the methane liner had not been placed" on the Mortgaged Property in accordance with Rule 13, and that the "[c]ap material had not been pre-qualified for gradation" as required by Rule 13.  (PX-9.)

g.  Naples said that the light posts in the parking lot "were supposed to have two methane vents," though most had only one.  (PX-9.)

h.  The need for environmental remediation at the Mortgaged Property created a "business environmental risk" that could "have a material environmental or environmentally-driven impact on the business associated with the current or planned use of a parcel of commercial real estate[.]"  (PX-9.)

79.  Defendant knew of, was willfully blind to, or consciously avoided learning of the HzW Report prior to May 30, 2007.  (PX-52.)

21

80.     In addition, prior to May 30, 2007, Defendant knew of, was willfully blind to, or consciously avoided learning of daily methane detection reports that were provided by testing services to Garfield, Wal-Mart, and the Ohio EPA.  (PX-48.)

      a.  On February 5, 2007, Hull reported high methane readings (nearly 100% of the LEL at one port) had been observed at the Wal-Mart store the previous day.  (PX-55; PX-56.)  As stated above, the Ohio EPA set 25% of the LEL for methane gas as the maximum permissible level of methane presence in the structures.  (PX-211; PX-213; Testimony of Peter Alvey; Def.'s Rule 56.1 Counterstatement ¶ 13.)

      b.  Nearly every day from August 8, 2006, to February 5, 2007, McCabe reported that field testing through bar punch studies detected methane at levels above 25% of the LEL.  (PX-367.)

      c.  Moreover, each day between February 1, 2007, and February 4, 2007, Alemko detected methane at levels of 100% of the LEL by the storm sewers of the City View Property.  (PX-367.)

81.     Defendant prepared three ASRs and provided them, for purposes of disclosure, to potential B-piece investors, including JER and LNR.  Two of the ASRs referenced the December 2006 methane gas intrusions to the Wal-Mart store and the resulting store closure.  Defendant believed that the environmental problems at the Wal-Mart store would be relevant and important to potential investors.  (PX-52; PX-57; PX-82; Testimony of James Chung; Testimony of Cynthia Eckes; Testimony of Kristin Sansone; Testimony of Ivan Yee.)

82.     The foregoing problems individually, or in some combination, were material and adverse environmental conditions or circumstances affecting the Mortgaged Property that were not disclosed in the Environmental Report.

83.     Defendant had actual knowledge of these inadequately disclosed material and adverse environmental conditions or circumstances, and it was willfully blind to, or consciously avoided, knowledge of these and additional surrounding facts.

84.     Defendant failed to satisfy its obligations under Exhibit 2, Section 12(i) of the MLPA, and under the implied covenant of good faith and fair dealing, to provide Plaintiff with a complete and current disclosure of material and adverse environmental conditions or circumstances affecting the Mortgaged Property.  Such failure to disclose constituted a breach of Defendant's warranty that the Environmental Representation must be "true and correct in all material respects."  (PX-99.)

G.     *Defendant's Breach of the Environmental Representation Constituted a "Material Breach" Under Section 5(b) of the MLPA*

85.     Under Section 5(b) of the MLPA, a "Material Breach" is one that "(i) materially and adversely affects the interests of the holders of the Certificates in the related Mortgage Loan" or "(ii) . . . materially and adversely affects the value of [a specially serviced] Mortgage Loan."  (PX-99.)

86.     Defendant's breach of the Environmental Representation materially and adversely affected both the interests of the holders of the Certificates in the Mortgage Loan and the value of the City View Loan.  (Testimony of Jenna Unell; Testimony of Russell J. Tuman; Testimony of Glenn Mitchell, Plaintiff's Rule 30(b)(6) Witness.)

87.     The material and adverse effect of Defendant's breach of Section 12(i) is evidenced by the matters discussed above, as well as the following matters that occurred after the

closing of the securitization and demonstrate the severity of the inadequately disclosed environmental problems.

88.     On June 21, 2007, less than a month after the securitization closed, counsel for Wal-Mart sent a notice of default to City View and Garfield.  (PX-363.)  Wal-Mart wrote that methane gas intrusion resulted from City View and Garfield's persistent failure to create sanitary sewer plumbing and methane venting systems.  (PX-363.)  Wal-Mart sent another notice of default on July 6, 2007, to City View.  (PX-112.)

89.     On December 11, 2007, a storm drain at the Mortgaged Property caught fire because of elevated methane levels.  (PX-128; Def.'s Rule 56.1 Counterstatement ¶ 22.)  On December 21, 2007, counsel for Wal-Mart stated that "[m]ethane contamination of the premises continues unabated."  (PX-132.)

90.     On March 18, 2008, the Ohio EPA issued an NOV stating that methane was detected at various locations at levels of 30% to 100% of the LEL.  (PX-140; Def.'s Rule 56.1 Counterstatement ¶ 22.)  Of 64 manholes tested on March 13, 2008, the majority recorded some level of landfill gas, and eight registered gas readings "in excess of 100% LEL."  (PX-140.)

91.     The Ohio EPA concluded:  "Landfill gas migrating into the storm and sanitary structures at the City View Center shopping center and accumulating at explosive levels within these structures is a threat to public health and safety . . . .  Immediately action must be taken to prevent the uncontrolled migration of landfill gas at this site."  (PX-140.)

92.     On March 20, 2008, the Northeast Ohio Regional Sewer District ("NORSD") reported to the Ohio EPA and the Attorney General of Ohio ("Ohio AG") that methane was detected at levels of 100% of the LEL.  (PX-142.)

24

93.     The NORSD report stated:  "It is unreasonable to assume that elevated LELs in the sewer system are from decomposing sewage.  It is much more likely . . . that methane is migrating from the landfill.  Levels like these are consistent with what we see in sewers adjacent to a gas line break."  (PX-142.)

94.     On April 4, 2008, counsel for Wal-Mart stated that "[c]ontrary to [City View's] assertions, the methane contamination of the Premises continues to be detected from time to time."  (PX-143.)  Wal-Mart stated that weekly methane detection reports confirmed its statement.  (PX-143.)

95.     In May 2008, the Ohio EPA asked the United States Environmental Protection Agency ("US EPA") for assistance in investigating the Mortgaged Property and "assess[ing] potential threats associated with methane and, potentially, other gases in storm and sanitary sewers, utility vaults[,] and subsurface soils in and around the City View Center."  (PX-167.)

96.     On June 18, 2008, the Ohio EPA issued another NOV stating that "[e]levated levels of explosive gas continue to be detected in the storm and sanitary sewers at the site."  (PX-149; Def.'s Rule 56.1 Counterstatement ¶ 22.)  The Ohio EPA stated that "landfill gas continues to migrate into the storm and sanitary structures at the City View Center shopping center and is accumulating at dangerous levels within these structures."  (PX-149.)

97.     The Ohio EPA also stated that additional land erosion and leachate existed at the site, and that McGill Property Group, LLC, and GHLFP LLC "continue[d] to illegally discharge leachate."  (PX-149.)

98.     On July 7, 2008, the Ohio AG filed a lawsuit on behalf of the Ohio EPA, alleging numerous environmental violations, such as improperly constructing the solid waste cap and failing to control leachate and methane at the Mortgaged Property.  (PX-151.)

99.     One of the defendants in the Ohio EPA lawsuit—a developer of the Mortgaged Property—settled the lawsuit by paying a $1.2 million civil penalty.  (PX-185; Def.'s Rule 56.1 Counterstatement ¶ 22.)

100.    On July 8, 2008, methane again was detected at the Mortgage Property at levels above 100% of the LEL.  (PX-153.)

101.    On July 18, 2008, the Ohio EPA stated:  "[L]andfill gas continues to migrate into the storm and sanitary structures at the City View Center shopping center and accumulating at explosive levels within these structures.  This is a threat to public health and safety . . . ."  (PX-156; PX-157.)

102.    In a letter dated August 28, 2008, the U.S. Department of Health and Human Services ("HHS") stated, after its a review of the City View Center, that there is an "urgent public hazard" because "explosive conditions at the site remain an imminent hazard."  (PX-166.)

103.    HHS stated that the landfill had not been properly closed.  (PX-166.)  The faulty environmental remediation system at the Mortgaged Property worsened over time, with the "integrity of the cap" becoming "further compromised" by waste excavated during construction and a "large quanti[t]y of the excavated waste" becoming damp and producing methane and other gases.  (PX-166.)

104.    HHS stated that "[a]n ignition source in such an environment could result in an explosion or fire."  (PX-166.)

105.    HHS recommended "immediate actions . . . to protect workers and members of the public who frequent the City View Center . . . ."  (PX-166.)

106.    In a letter dated August 29, 2008, the US EPA told the Ohio EPA that methane was detected at levels of above 100% of the LEL, and that explosive levels of methane were detected in the air.  (PX-167.)

107.    In a September 3, 2008 letter, the Ohio EPA stated:  "While Ohio EPA believes that the conversion of landfills to productive uses such as shopping centers is a worthy idea, the construction of such projects *must* be done carefully and in precise accordance with Ohio EPA approved engineering and environmental requirements.  This has not happened at City View, resulting in significant issues like methane generation and migration, leachate problems, and stability issues."  (PX-168.)

108.    Faced with continuing safety concerns caused by methane gas intrusion, Wal-Mart sent a final Notice of Default on September 5, 2008, and closed its store on September 15, 2008.  (PX-170; PX-173; PX-174; Stipulated Facts ¶ 23.)

109.    In a letter dated September 8, 2008, counsel for Wal-Mart stated that environmental problems at the site largely caused the store's closure.  (PX-174.)  A "predominant[]" reason for the closure was the methane gas intrusion.  (West Dep. 98:14-20; Testimony of Romona West, Wal-Mart's Rule 30(b)(6) Witness.)

110.    On October 24, 2008, counsel for Wal-Mart stated that the store was no longer paying rent because "the Premises are untenantable" in light of the environmental conditions. (PX-180.)

111.    In January 2009, Wal-Mart terminated its lease, citing "methane intrusion to the common areas" of the store and other issues.  (PX-193; Testimony of Romona West, Wal-Mart's Rule 30(b)(6) Witness; Stipulated Facts ¶ 26.)

**H.**    ***After Wal-Mart Moved Out, the City View Center Failed***

112.    Material and adverse effects relating to nondisclosure in breach of the Environmental Representation are further demonstrated by the fact that, after Wal-Mart terminated its store lease, the City View Center suffered a sharp decline in business and ultimately failed.

113.    As a result of Wal-Mart's lease termination, other tenants in the City View Property, such as PetSmart, Inc. ("PetSmart"), and Jo-Ann Stores Inc., closed their stores and vacated the premises soon afterward.  (Testimony of Romona West, Wal-Mart's Rule 30(b)(6) Witness; Testimony of Russell J. Tuman; Testimony of Heather Dennis, Wells Fargo's Rule 30(b)(6) Witness.)

114.    Other City View tenants invoked their respective co-tenancy clauses.  For instance, PetSmart had the right to reduce rent by 50% if Wal-Mart stopped "conduct[ing] business" at the site for 120 consecutive days.  (PX-369; PX-370; PX-371.)  If Wal-Mart stopped conducting business for a year, PetSmart could "terminate this Lease by giving written notice." (PX-369; PX-370; PX-371.)  The other leases had similar provisions.  (PX-369; PX-370.)

115.    On February 19, 2009, the Special Servicer filed a petition for receivership in the United States District Court for the Northern District of Ohio.  The Court entered an Order Appointing Receiver on February 23, 2009.  (PX-197; Testimony of Jennifer Wilkicki; Testimony of Jenna Unell).

116.    While the Mortgaged Property was in receivership, the value of the Mortgage Loan collapsed along with the value of the underlying Mortgaged Property.  (Testimony of Russell J. Tuman; Def.'s Rule 56.1 Counterstatement ¶ 77.)

117.    In July 2010, an appraisal of the Mortgaged Property valued it at $4.5 million. (PX-365; Testimony of Russell J. Tuman.)

118.    In November 2010, a new, second methane extraction system was put into operation at the Mortgaged Property.  (PX-364.)  Nevertheless, as of November 2010, "[t]he property [was] still in poor environmental condition."  (PX-364.)

119.    To the extent that Plaintiff was required to mitigate damages, it fully met its obligation.  The Special Servicer worked with the receiver to mitigate losses and sell the Mortgage Loan or the City View Property.  (PX-365.)

120.    At least 12 prospective buyers executed confidentiality agreements to obtain information for a possible bid.

121.    On November 2, 2010, the receiver stated:  "[M]any of the tenants are gone, not coming back and do not exist anymore."  (PX-372)

122.    Because of "considerable challenges" at the Mortgaged Property, "including methane issues" that had impacted continued occupancy, only one of the 12 prospective buyers made a *bona fide* offer.  (PX-372; PX-373.)

123.    That prospective buyer, known as CVC Acquisition, ultimately declined to purchase the Mortgage Loan.  (Testimony of Russell J. Tuman; Testimony of Jennifer Wilkicki.)

124.    Despite the Special Servicer's efforts, the remaining prospective buyers never made offers.  (Testimony of Russell J. Tuman; Testimony of Jennifer Wilkicki.)

125.    As of April 11, 2011, only 38% of the Mortgaged Property was occupied, only three of the tenants were paying contract rent, and the anchor and four junior anchor spots remained vacant.  (Testimony of Russell J. Tuman; Testimony of Jennifer Wilkicki.)

**I.      *The Special Servicer Gave Defendant Timely Notice of Breach and Request for Cure***

126.    Under the MLPA, the Special Servicer was required to give Defendant notice of, and request to cure, a material breach promptly after discovering the breach.  *Bank of N.Y.*

29

*Mellon Tr. Co. v. Morgan Stanley Mortg. Capital, Inc.*, 821 F.3d 297, 304 (2d Cir. 2016).

Plaintiff substantially performed this notice obligation.

127.   Wells Fargo, the Master Servicer for the Mortgage Loan, transferred the loan to the Special Servicer on November 12, 2008.  (Stipulated Facts ¶ 25; Testimony of Roy Owen.)

128.   The decision to transfer the Mortgage Loan for special servicing is dictated by the terms of the PSA and was a decision made by the Master Servicer.  The Special Servicer had no authority to administer the City View Loan until after the Mortgage Loan had been transferred to it on November 12, 2008.  (PX-181; PX-182; Testimony of Jennifer Wilkicki; Testimony of Russell Tuman; Testimony of Jeanne Brewster; Testimony of Paul Smyth.)

129.   An investigation of potential breaches of contract by a seller of mortgage loans may occur in connection with a special servicer's administration of the defaulted loan.  This occurred with respect to the City View Loan.  (Testimony of Jennifer Wilkicki.)

130.   On January 13, 2009, the Special Servicer received from the Master Servicer a voluminous set of documents regarding the City View Loan and the City View Center.  The asset manager assigned to work on the Loan, Jennifer Wilkicki ("Wilkicki"), completed her initial review of documents on February 10, 2009.  (Testimony of Jennifer Wilkicki.)

131.   By mid-February 2009, Wilkicki had prepared a summary of the City View Loan records that had been provided by the Master Servicer.  In the summary, Wilkicki stated her belief that Defendant may have breached the Environmental Representation and that there may be additional evidence in that regard.  Wilkicki gave the summary to in-house counsel for review and analysis of the information Wilkicki had identified.  (PX-194; PX-399; Testimony of Jennifer Wilkicki.)

132.     Jenna Unell ("Unell")—in-house counsel for Special Servicer—conducted factual and legal analyses and review of the potential breach claim.  Unell evaluated issues and questions such as the extent of Morgan Stanley's knowledge of environmental problems at the time of the securitization, the extent of Morgan Stanley's disclosures concerning environmental conditions, and the materiality of any lack of disclosure.  (Testimony of Jenna Unell.)

133.     Wilkicki also continued to gather information about the City View Center.  Under the PSA and federal regulations governing mortgage loan transactions, the Special Servicer was required to have independent, third-party appraisals of the value of the City View Center.  This was necessary to document that Defendant's breach had a material and adverse impact on the interests of the Investors or the value of the Loan.  The appraisals of the then-current value of the City View Center were completed by March 13, 2009.  (PX-100; PX-365; Testimony of Jennifer Wilkicki; Testimony of Jenna Unell.)

134.     In early March 2009, Wilkicki and Unell prepared a draft Notice of Material Breach.  Under the Special Servicer's company policy, a notice of breach could not be transmitted without specific approval from senior management.  (Testimony of Jenna Unell; Testimony of Jennifer Wilkicki.)

135.     Such approval was required because giving notice could have significant consequences, both for the Special Servicer's business and for Morgan Stanley.  For instance, under the MLPA, the Notice had to be reported to the bond rating agencies, when it would become public that Morgan Stanley was charged with breach of a representation when it sold the Loan.  Public disclosure would be particularly significant because of Morgan Stanley's reputation, size, and influence in the global marketplace. (Testimony of Jennifer Wilkicki; Deposition Testimony of Christopher Crouch; Deposition Testimony of Paul Smyth.)

31

136.    In accordance with company policy, on March 14, 2009, Wilkicki forwarded the draft Notice to Christopher Crouch ("Crouch"), head of the Special Servicing Unit, for review and approval.  Crouch approved the Notice on March 16, 2009.  Wilkicki then sent the Notice to Special Servicer's president, Paul Smyth ("Smyth"), for final approval.  Smyth approved the Notice on March 18, 2009.  (Testimony of Jenna Unell; Testimony of Jennifer Wilkicki; Testimony of Christopher Crouch; Testimony of Paul Smyth.)

137.    On March 18, 2009, the Special Servicer sent the Notice of Material Breach to Morgan Stanley and others, as required by the MLPA.  (PX-200.)

138.    The first notice of breach, on March 18, 2009, notified Defendant of its material breach of the Environmental Representation as required by the MLPA.  (PX-99; PX-408.)  The notice of breach stated: "The Special Servicer discovered that the Seller was aware of material and adverse environmental conditions and circumstances affecting the Mortgaged Property that were not disclosed in the Environmental Report."  (PX-408.)

139.    The second notice of breach, dated September 24, 2010, provided, *inter alia*, supplemental facts supporting the breach of the Environmental Representation as noticed in the first notice of breach.  (PX-205, at P00362.)  As a matter of fact and law, those supplemental facts are part and parcel of the timely first notice of breach, and are separate and distinct from the new and independent breach in the second notice.  (PX-205, at P00361 ("Following on the Special Servicer's letter of March 18, 2009 (the 'First Notification of Material Breach'), this letter serves as the second and supplemental notification of Material Breaches of certain representations and warranties made by Morgan Stanley Mortgage Capital, Inc. (the 'Seller') of the Mortgage Loan referenced above.  Among other things, this letter includes: (i) facts which

32

supplement and further support the First Notification of Material Breach, and (ii) notification of an independent and newly discovered Material Breach.").)

140.    Whether or not the Special Servicer gave notice to Morgan Stanley promptly, the Notice and Request to Cure constituted substantial performance of Special Servicer's notice obligation.  Any perceived delay in giving notice was immaterial as a matter of fact and law because it was relatively brief and Defendant's breach could not be cured, and in any event, Defendant suffered no injury from any delay.  *Bank of N.Y. Mellon Tr.*, 821 F.3d at 312-13.

141.    Because of Defendant's breach of the Environmental Representation, Plaintiff is entitled to damages as provided under law and by contract.  (PX-38; PX-100; Testimony of Jenna Unell.)

## DEFENDANT'S CONTENTIONS[1]

## I.    The allegations contained in the First Notice[2] did not identify a breach of the Environmental Representation.

---

[1] In making these Contentions, Morgan Stanley neither limits nor intends to limit the evidence that it will offer at trial.  Because of the extent of the record in this action, Morgan Stanley intends for its citations to exhibits and anticipated testimony to be illustrative rather than exhaustive.

[2] The "First Notice" is a notice sent by Centerline to Morgan Stanley and other parties on March 18, 2009.  This notice purported to describe a "Material Breach" of the Environmental Representation based solely on the alleged non-disclosure of NOVs.  On September 24, 2010, the Special Servicer sent to Morgan Stanley a second notice (the "Second Notice"), in which it alleged for the first time that Morgan Stanley breached the Environmental Representation based on an allegedly undisclosed methane intrusion at the Wal-Mart store on the Property.  In its June 19, 2013 decision, this Court found that the Second Notice was untimely because it was sent to Morgan Stanley more than 18 months after the Special Servicer concluded its investigation and only after the Special Servicer's litigation counsel decided to "search for new claims" based on known facts.  See Bank of N.Y. Mellon Trust Co. v. Morgan Stanley Mortg. Capital, 2013 U.S. Dist. LEXIS 87863, at *51 (S.D.N.Y. June 19, 2013) ("On the record before me, one of the notices may be timely; the other is plainly not."); see also id. at *35-36 ("It is undisputed that all facts about the City View loan were known to the Special Service[r] by the time the First Notice of Material Breach was filed. Nonetheless, a year and a half later,. . . the Trustee's counsel in the present action . . . allegedly 'discovered' a second Material Breach of the MLPA: namely, that Morgan Stanley had breached the No Material Default Representation by making that representation at the time of the securitization, even though it knew that City View had defaulted under its lease with Wal-Mart, which constituted a default under the Loan Agreement.  The Trustee asserts that [its litigation counsel] first became 'aware' of this breach on September 21, 2010.  Three days later, on September 24, 2010, the Special Servicer issued the 'Second Notice of Material Breach' (or the 'Second Notice'), alleging additional facts demonstrating a breach of the Environmental Representation, as well as alleging a breach of the No Material Default Representation."); id. at *38-39 (noting Morgan Stanley's contention, in

A.    In the Environmental Representation, Morgan Stanley represented that it "ha[d] no knowledge of any material and adverse environmental condition or circumstance affecting [the Property] that was not disclosed" in the IVI Report.  In the First Notice, the Special Servicer alleged that Morgan Stanley breached the Environmental Representation because (i) the IVI Report "did not reference outstanding notices of violation"; (ii) these allegedly undisclosed NOVs amounted to a material and adverse environmental condition or circumstance; and (iii) Morgan Stanley knew of such an undisclosed condition or circumstance.  Morgan Stanley contends that the allegations in the First Notice are incorrect and did not identify a breach of the Environmental Representation.

1.    The IVI Report **did** reference outstanding NOVs and even included a cost estimate for resolving them.

a)    The Special Servicer concluded otherwise based on its mistaken assessment of a document called a "Closing Counsel Transaction Summary" that was prepared in connection with the Mortgage Loan's December 2006 closing.

b)    The Closing Counsel summary stated that the IVI Report that existed at that time did not address NOVs issued by the Ohio EPA.

---

responding to the Second Notice and in moving for summary judgment, that "both the First and Second Notices" were untimely); id. at *62 ("The Special Servicer has acknowledged that a subsequent investigation conducted by . . . the Trustee's counse[l] into potential breaches of the representations and warranties — which did not take place until September 2010 — did not reveal any new facts about the loan or conditions at the site."); id. at *63 ("The Special Servicer had in its possession all of the facts necessary to investigate and bring a claim for breach of the No Material Default Representation at the latest by March 16, 2009, when it 'concluded' its first investigation into possible breaches of the representations. . . .  The Special Servicer seemingly did nothing to mine the data in its possession for the next eighteen months, until litigation counsel decided to search for new claims.  But this does not suffice."); id. at *64 ("Eighteen months after discovery of all relevant facts is neither prompt nor diligent.").

Were this Court to determine that, notwithstanding its prior decision, Plaintiff will be permitted to pursue its Environmental Representation claim at trial based on allegations contained in the Second Notice, Morgan Stanley intends to include a contention addressing the alleged non-disclosure of methane intrusions, and reserves its right to do so.  In the absence of such a determination, however, Morgan Stanley limits its contentions to the Material Breach alleged in the First Notice.

c)   However, after the December 2006 closing, Morgan Stanley specifically requested that the IVI Report be updated to reflect outstanding violations and the estimated costs associated with them, and the IVI Report was specifically amended to do so.

d)   Because the IVI Report clearly did refer to outstanding NOVs, it was only in September 2010—well after the Special Servicer completed its investigation and sent the First Notice—that the Special Servicer's litigation counsel contrived an entirely distinct breach theory, and sent an entirely new notice, based primarily on the allegedly undisclosed existence of methane intrusions at the Wal-Mart tenancy.

e)   This second notice, and the new allegations it asserted, are no longer a part of this case.

2.   Even assuming the IVI Report did not reference outstanding NOVs, the existence of an outstanding NOV is not a "material and adverse environmental condition or circumstance."

a)   Notices of violation are regulatory concerns, not environmental conditions or circumstances.

b)   Even if an NOV could amount to a material and adverse environmental condition, none of the pre-securitization NOVs concerning the Property amounted to such a condition here because they related to filing, disclosure, construction, permitting, or monitoring requirements.

3.   Even assuming any pre-securitization NOV amounted to a material environmental condition, Morgan Stanley did not have knowledge of such an NOV.   The Special

Servicer based such a claim entirely on the Closing Counsel Transaction Summary, but its assessment was incorrect.

4.      Even assuming the IVI Report failed to disclose any relevant outstanding NOV of which Morgan Stanley was aware, that failure was not "material" within the meaning of Section 12(i) and 4 of the MLPA.

a)   The Environmental Representation can only be breached if an undisclosed environmental condition or circumstance is "material."  Similarly, Morgan Stanley only warranted in Section 4 of the MLPA that the representations set forth in Exhibit 2 would be "true and correct in all material respects" as of the Closing Date.

b)   An omission can only be material if its disclosure would have been viewed by a reasonable investor as having significantly altered the total mix of information already made available to it.

c)   Any failure by the IVI Report to disclose an NOV was immaterial in light of the information it did disclose, the multitude of other NOV-related disclosures made to investors and rating agencies prior to the securitization's closing, and the reserves, indemnities, and other contractual commitments and protections put in place to address existing NOVs.  (*See also* Contention II.A.1.)

**Exhibits**: DX-24; DX-27; DX-31; DX-40; DX-49; DX-54; DX-64; DX-65; DX-71; DX-94; DX-97; DX-104; DX-105; DX-107; DX-129; DX-173; DX-181; DX-183; DX-184; DX-191; DX-195; DX-223; DX-227; DX-229; DX-232; DX-245; DX-249; DX-270; DX-274; DX-275; DX-276; DX-277; DX-278; DX-279; DX-281B; DX-281V; DX-281FF; DX-291; DX-294; DX-309; DX-311; DX-323; DX-326; DX-339; DX-340; DX-573; DX-613; DX-650; DX-671

**Anticipated Testimony**: Demchak; Eckes; Fowler; King; Lewis; Mazzerella/Montgomery; Powell; Row; Sampson; Sansone; Schnapf; Unell; Wilkicki

**II.     The breach described in the First Notice is not a Material Breach.**

A.     The MLPA remedy that Plaintiff seeks to enforce in this action is only available for a "Material Breach."  The MLPA defines a "Material Breach," in relevant part, as a breach that "materially and adversely affects the value of the Mortgage Loan."  Morgan Stanley contends that, even assuming the First Notice identified a breach of the Environmental Representation, that breach did not meet this definition of a "Material Breach."

1.     Any failure by the IVI Report to disclose outstanding NOVs did not affect the Loan's value because their existence was disclosed in the Prospectus Supplement, Private Placement Memorandum, Asset Summary Report, and a multitude of other documents sent to or made available to investors and rating agencies prior to securitization.

a)     Through these disclosure channels, the existence of NOVs was impounded into the price of the Loan at the time it was sold to investors.

b)     Any alleged omission in the IVI Report therefore did not and could not have affected the Mortgage Loan's value at the time of securitization or any point thereafter.

2.     Even assuming the existence of pre-securitization NOVs was not priced into the Loan at the time of securitization, any revelation about their existence did not affect the Loan's value as of late 2008 or early 2009.

a)     The MLPA's definition of a "Material Breach" as a breach that "affects" the value of a loan means that the breach must have had a present impact on the loan's value at the time of the breach's discovery.

b)     Any decline in the Loan's value on the date the breach alleged in the First Notice was discovered by the Special Servicer was not due to the revelation of any outstanding pre-securitization NOV, but rather a number of other factors—namely,

the general decline in the economy, Wal-Mart's decision to vacate the Property for

reasons unrelated to pre-securitization NOVs, the Master and Special Servicers'

failures to properly service the Mortgage Loan, and the failure of the developer,

borrower, and other responsible parties to meet their contractual obligations

relating to the Property.

**Exhibits**:  DX-173; DX-265; DX-272; DX-276; DX-279; DX-281A; DX-281B; DX-281D; DX-281F; DX-281K; DX-281M; DX-281V; DX-281CC; DX-281EE; DX-281FF; DX-287; DX-288; DX-289; DX-297; DX-303; DX-323; DX-324; DX-330; DX-337; DX-338; DX-339; DX-340; DX-369; DX-371; DX-372; DX-411; DX-412; DX-414; DX-428; DX-432; DX-441; DX-443; DX-444; DX-445; DX-450; DX-452; DX-453; DX-457; DX-460; DX-468; DX-487; DX-493; DX-499; DX-501; DX-502; DX-510; DX-511; DX-514; DX-515; DX-523; DX-531; DX-537; DX-539; DX-540; DX-541; DX-543; DX-546; DX-547; DX-549; DX-550; DX-557; DX-562; DX-574; DX-578; DX-580; DX-585; DX-592; DX-599; DX-623; DX-624; DX-639; DX-647; DX-655; DX-664

**Anticipated Testimony**:   Brewster; Butler; Chung; Crouch; Dennis; Eckes; Holmes; Mitchell; Ritley; Row; Sampson; Sansone; Shapiro; Smith; Smyth; Tuman; Unell; West; Wilkicki; Yee

### III.   Plaintiff failed to substantially perform its obligations to provide prompt notice of and a request to cure the Material Breach described in the First Notice.

A.   The MLPA and PSA both require "prompt" written notice of, and a request to cure, a

Material Breach.  The word "promptly," when used in the request-to-cure provision, is expressly

defined to mean "within three Business Days."   The word "promptly," when used within the

notice provision, also means within three business days.   Morgan Stanley contends that the

Special Servicer failed to substantially perform these contractual obligations.

1.   The Special Servicer is charged with discovery and awareness of a Material Breach

on the date when it had a reasonable opportunity to investigate and confirm its suspicions

of such a breach.

2.     The Special Servicer had a reasonable opportunity to investigate and confirm any suspicions it had about the IVI Report's alleged failure to disclose outstanding NOVs by no later than mid-February 2009.

3.     The Special Servicer cannot delay the date of its awareness based on any professed need for chain-of-command review because such review was not required under its policy and no substantive review of the First Notice was actually performed by the Special Servicer's senior management.

4.     The Special Servicer's failure to provide timely notice of and a request to cure was willful because it unduly delayed sending the First Notice while fully aware of the PSA's demand for "prompt" action.

5.     The Special Servicer's failure to provide timely notice and a request to cure undermined the purpose of the MLPA's and PSA's mandates for "prompt" action and prejudiced Morgan Stanley by hindering its ability to cure the materiality of the Material Breach (as opposed to the underlying breach itself) described in the First Notice.  The materiality of the Material Breach could have been cured by, for example, ensuring that the borrower and other parties responsible for the Property's maintenance and construction properly addressed or compensated the Trust for any harm caused by pre-securitization NOVs that still existed as of late 2008 or early 2009.

**Exhibits**:     DX-39; DX-323; DX-324; DX-493; DX-495; DX-496; DX-497; DX-498; DX-499; DX-504; DX-507; DX-508; DX-509; DX-510; DX-512; DX-514; DX-515; DX-517; DX-519; DX-521; DX-522; DX-523; DX-531; DX-535; DX-536; DX-538; DX-539; DX-540; DX-543; DX-545; DX-546; DX-548; DX-559; DX-561; DX-564; DX-573; DX-579; DX-585; DX-587; DX-588; DX-590; DX-593; DX-595; DX-598; DX-603; DX-604; DX-605; DX-606; DX-607; DX-609; DX-610; DX-611; DX-613

**Anticipated Testimony**: Butler; Crouch; O'Halloran; Row; Shapiro; Smyth; Tuman; Unell; Wilkicki

**IV.    Plaintiff failed to mitigate any damages it may have suffered due to the alleged Material Breach described in the First Notice.**

A.    Plaintiff and the entities acting on its behalf were under an obligation to mitigate any damages that may have been suffered due to the Material Breach described in the First Notice. Plaintiff failed to fulfill this obligation because the Master and/or Special Servicer failed to take such reasonable steps as transferring the Loan to special servicing in a timely manner and otherwise properly servicing the Mortgage Loan; ensuring that the Mortgage Loan's developer, borrower, and other responsible parties fulfilled their contractual undertakings with respect to the Property and other financial commitments and guarantees; holding Wal-Mart responsible for improperly abating its rent and terminating its lease; enforcing insurance claims; pursuing new or replacement tenants; pursuing a sale of the Property; promptly appointing a receiver; and, as shown above, failing to provide Morgan Stanley with prompt written notice and a request to cure the Material Breach described in the First Notice.

**Exhibits**:    DX-39; DX-142; DX-173; DX-323; DX-324; DX-363; DX-369; DX-414; DX-415; DX-428; DX-441; DX-443; DX-444; DX-445; DX-450; DX-453; DX-457; DX-460; DX-468; DX-480; DX-487; DX-493; DX-495; DX-496; DX-497; DX-498; DX-499; DX-504; DX-507; DX-508; DX-509; DX-510; DX-511; DX-512; DX-514; DX-515; DX-517; DX-519; DX-521; DX-522; DX-523; DX-531; DX-535; DX-536; DX-537;  DX-538; DX-539; DX-540; DX-541; DX-542; DX-543; DX-545; DX-546; DX-547; DX-548; DX-549; DX-550; DX-559; DX-561; DX-562; DX-564; DX-573; DX-574; DX-578; DX-579; DX-580; DX-585; DX-587; DX-588; DX-590; DX-592; DX-593; DX-595; DX-598; DX-599; DX-603; DX-604; DX-605; DX-606; DX-607; DX-609; DX-610; DX-611; DX-613; DX-623; DX-624; DX-639; DX-647; DX-655; DX-664

**Anticipated Testimony**:  Brewster; Butler; Crouch; Dennis; O'Halloran; Row; Shapiro; Smyth; Tuman; Unell; Wilkicki

V.    ISSUES TO BE TRIED[3]

Plaintiff's statement of the issues to be tried:

---

[3] The parties were unable to agree upon a joint statement of the issues to be tried for reasons they anticipate developing in their forthcoming in limine motions.  The parties anticipate that the Court's decision on those motions will clarify the issues to be tried at trial.

1. Whether Morgan Stanley breached the Environmental Representation.

2. Whether Morgan Stanley's breach of the Environmental Representation constituted a "Material Breach" pursuant to Section 5(b) of MLPA.

   a. Whether the breach "materially and adversely affected the interests of the holders of the Certificates in the . . . Mortgage Loan."

   b. In the alternative, whether the breach "materially and adversely affect[ed] the value of the Mortgage Loan."

3. Whether Plaintiff substantially performed its obligation to give Morgan Stanley prompt notice of breach and request to cure.

4. What sum of money does Morgan Stanley owe Plaintiff for its breach of the Environmental Representation.[4]

Morgan Stanley's statement of the issues to be tried:

1. Whether Morgan Stanley committed the breach of the Environmental Representation described in the First Notice.

2. Whether the breach described in the First Notice constituted a "Material Breach" pursuant to Section 5(b) of the MLPA because it materially and adversely affected the value of the Mortgage Loan.

3. If the breach described in the First Notice constituted a "Material Breach," whether Plaintiff substantially performed its obligations to provide prompt notice of and a prompt request to cure such Material Breach.

4. Whether and in what amount Plaintiff should be awarded damages in this action after considering whether and to what extent Plaintiff has fulfilled its duty to mitigate damages.

VI.    PLAINTIFF'S EXHIBITS

---

[4] If the jury returns a verdict for Plaintiff on liability, Plaintiff requests that the Court enter a judgment on the verdict, with the amount either agreed by the parties, or computed by the Court, pursuant to the Purchase Price formula, with post-trial evidentiary submissions and a hearing, if necessary. Morgan Stanley contends that the entire damages analysis should be performed by the jury because any sum awarded to Plaintiff must be reduced by the extent to which it failed to mitigate its damages, which is an issue for the jury to resolve.

With the exception of demonstrative exhibits, no exhibit not listed below may be used at trial except (a) for cross-examination purposes or (b) if good cause for its exclusion from the pretrial order is shown.  Plaintiff's Exhibits and Defendant's specific objections thereto are listed on **Appendix A** attached hereto.

## VII.  DEFENDANT'S EXHIBITS

With the exception of demonstrative exhibits, no exhibit not listed below may be used at trial except (a) for cross-examination purposes or (b) if good cause for its exclusion from the pretrial order is shown.  Defendant's Exhibits and Plaintiff's specific objections thereo are listed on **Appendix B** attached hereto.

## VIII.  STIPULATIONS AND OBJECTIONS WITH RESPECT TO EXHIBITS

Any objections not set forth herein, or in Appendices A and B referenced above, will be considered waived absent good cause shown.

Stipulation No. 1:  The parties agree that, to the extent a document is substantively identical to a document on the parties' exhibit lists (for example, a substantively identical document that was produced with a different bates range), that substantively identical document shall not be excluded from use with a witness or admission into evidence solely because that document is not included as an exhibit on either party's exhibit list.  The purpose and intent of this stipulation is to avoid jury confusion, and avoid including potentially unnecessary deposition exhibits and duplicative exhibits on the parties' exhibit lists.  The parties reserve all other objections.

The parties agree to confer prior to trial regarding stipulations as to the authenticity and admissibility of their proposed trial exhibits.

## IX.  PLAINTIFF'S WITNESS LIST

42

Attached hereto as **Appendix C** is (1) Plaintiff's witness list, along with (2) Plaintiff's deposition designations and all corresponding objections and counter-designations.  The witnesses listed in Appendix C may be called at trial by Plaintiff.  No witness not identified herein shall be permitted to testify on Plaintiff's case in chief absent good cause shown.

## X.    DEFENDANT'S WITNESS LIST

Attached hereto as **Appendix D** is (1) Defendant's witness list, along with (2) Defendant's deposition designations and all corresponding objections and counter-designations. The witnesses listed in Appendix D may be called at trial by Defendant.  No witness not identified herein shall be permitted to testify on Defendants's case in chief absent good cause shown.

## XI.    RELIEF SOUGHT

Plaintiff seeks damages pursuant to the Purchase Price formula set forth in the MLPA and PSA.  As defined therein, damages are equal to the sum of:  (A) 100% of the Stated Principal Balance of the Mortgage Loan as of the date of purchase; (B) accrued but unpaid interest; (C) the amount of any expenses related to the Mortgage Loan and all unpaid Special Servicing Fees and Liquidation Fees; (D) all expenses reasonably incurred or to be incurred by C-III and Bank of New York in respect of Morgan Stanley's breach of the Environmental Representation giving rise to the repurchase obligation.

In the alternative, Plaintiff requests injuctive relief requiring Defendant to repurchase the Mortgage Loan and such other relief as the Court deems appropriate.

Dated:  November 22, 2016
        New York, New York

 

_____
Chief U.S. District Judge

**BOIES, SCHILLER & FLEXNER LLP**
By: //S// David A. Barrett
David A. Barrett
Sean F. O'Shea
Michael E. Petrella
575 Lexington Avenue
New York, NY 10022
Tel: (212) 446-2300
Fax: (212) 446-2350
*Attorneys for Plaintiff*

**MARINO, TORTORELLA & BOYLE, P.C.**
By: //S// Kevin H. Marino
Kevin H. Marino
John D. Tortorella
Erez J. Davy
437 Southern Boulevard
Chatham, New Jersey 07928-1488
Tel: (973) 824-9300
Fax: (212) 488-1220
*Attorneys for Defendant*

**KOBRE & KIM LLP**
Steven G. Kobre
Steven W. Perlstein
Josef M. Klazen
Lara Levinson
800 Third Avenue
New York, New York 10022
Tel:  (212) 488-1200
Fax: (212) 488-1220
*Attorneys for Defendant*